## ED WELCH v. THE STATE.

### No. 63. Decided October 27, 1909.

**1.—Murder—Evidence—Position of Body of Deceased.**

Upon trial for murder there was no error in permitting the State to show, by the testimony of a State's witness, the position in which the body of the deceased was lying at the time the witness reached it; and an objection that the State must first show that said body had not been disturbed, and the position left unchanged after the killing, was untenable; besides, other testimony showed the same facts.

**2.—Same—Evidence—Expert Testimony.**

Where, upon trial for murder, the State's witness had sufficiently qualified as an expert with reference to the question of entry and exit of the bullets by appearance of the wounds upon the deceased, there was no error to permit the witness to give his opinion as to what wounds on said body showed the place of entry of the bullets.

**3.—Same—Evidence—Contradicting Witness—Animus of Witness—Bill of Exceptions.**

Where, upon trial for murder, the defense sought to attack the credibility of one of the State's witnesses by asking him whether the deceased was not a

fugitive from justice at the time witness harbored him at his place, to which the State objected, and the court's explanation to the bill of exceptions certified that there was no statement made to the court that the said witness knew the deceased was a fugitive from justice, there was no merit in the bill.

#### 4.—Same—Evidence—Bill of Exceptions.

Where, upon appeal from a conviction of murder, the testimony rejected, as explained by the court in appellant's bill of exception, was immaterial, there was no error.

#### 5.—Same—Evidence—Bill of Exceptions.

Where, upon appeal from a conviction of murder, the bill of exceptions did not set out the purport or substance of the conversation which appellant attempted to introduce in evidence at the trial, the same could not be considered on appeal.

#### 6.—Same—Evidence—Irrelevant Testimony.

Where, upon trial for murder, there had been no effort by the State to impeach the defendant's witness, nor anything in the cross-examination or the record that would have in any event required or justified, or rendered valuable to the defense testimony offered in support of said witness, there was no error in rejecting same.

#### 7.—Same—Evidence—Former Trial—Husband and Wife.

Where, upon trial for murder, the State was permitted to ask the defendant on cross-examination: "If your mother and your wife say, or testify, that you *did not come back home from the time that you left that morning* until about four o'clock, is that correct?" and on objection by the defense withdrew said question, and requested the court to instruct the jury not to consider the matter for any purpose, which was done, and there was no admission by the State to the effect that defendant's wife had not testified, and no request from the defendant to instruct the jury that the wife had not so testified at a former trial, and there was nothing to show to what she did testify to at said former trial, there was no error.

#### 8.—Same—Evidence—Contradicting Defendant as a Witness.

Where, upon trial for murder, the defendant testified that the deceased cut him through his shirts across the breast with a knife, and no witnesses were produced by the defense sustaining this statement, there was no error in the cross-examination of the defendant to question and impeach the correctness and truthfulness of this testimony; this was no allusion to defendant's failure to testify.

#### 9.—Same—Charge of Court—Justifiable Homicide—Robbery—Self-Defense.

Where, upon trial for murder, there was testimony by the defendant that, while the defendant and deceased were discussing some matter about the sale or purchase of a pistol, the defendant took out his money purse, and thereupon the deceased grabbed at the same, or knocked it out of his hand, and that while defendant was remonstrating with deceased the latter rushed upon him and struck him with a knife, and that defendant immediately ran to his horse, seized his gun and shot and killed deceased, and the court in his charge substantially submitted these facts to the jury, with instructions to acquit if they so found or had reasonable doubt thereof. Held, that the question of justifiable homicide, to prevent robbery, was sufficiently submitted to protect defendant's rights; besides, the court, in connection with said charge, instructed fully upon all phases of self-defense in the case.

#### 10.—Same—Sufficiency of the Evidence.

Where, upon trial for murder, the testimony was sufficient to justify a verdict of murder in the second degree, the same will not be disturbed on appeal.

Appeal from the District Court of Uvalde. Tried below before the Hon. R. H. Burney.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*W. C. Linden* and *John R. Storms* and *John W. Hill,* for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—On the 5th day of March, 1907, the grand jury of Edwards County returned an indictment against Ed Welch, charging him with the murder of one Ben Tanner. Quite a while thereafter the case was transferred on change of venue to Uvalde County, and a trial there had on April 10 of this year resulted in a conviction of murder in the second degree, the jury assessing appellant's punishment at twenty-five years confinement in the State penitentiary.

While not so voluminous, the record in the case contains references to so many points and places that we are not sure that we have wholly and fully comprehended or understood all of them. However, the essential facts are that for some little time before the homicide, which occurred on the 28th day of January, 1907, deceased was making his home at the residence of one W. F. McCulloch, in Edwards County, and had been living there for some little time. He left the McCulloch house early in the morning of January 28, 1907, and did not return. Shortly after dark of that day his body was found near a river or creek, referred to as Hackberry, some two and one-half miles from where McCulloch lived. His body when found was lying across the road. There was a shot, evidently a wound of entry, in the back of his head; a larger wound in the forehead, and one near the top of his head. The testimony of the physician called convinces us that these wounds were made by one and the same shot. This witness on direct examination gives it as his opinion that the bullet entered the back of the head, ranged downward and that its course was deflected by it striking a hard bone near the base of the skull, probably splitting the bullet, and causing the wound in the forehead as well as the wound in the top of the head. By his side and in the crook of his arm was found a black-handle knife. There was no evidence showing that this was the knife of deceased, but on the contrary the evidence renders it practically certain that he had no such knife. When found deceased had on a pair of brogan shoes, one of which was on but unlaced, and the other shoe was only partly on his foot. Witnesses differ somewhat as to just how far the shoes were on, but this probably is a fair summary of all the testimony. The evidence also tended to show that the inside of the pockets of his trousers

had been slightly pulled up, and also tended to show that his coat was pulled up somewhat under his back. There was a pocketbook found lying near where the body was found, and also a cartridge which had not been exploded, and near by the shell of an exploded cartridge. The testimony of McCulloch and his wife tends to show that the pocketbook found was the pocketbook of deceased. Appellant's testimony was to the effect that it was his pocketbook. In this pocketbook there were two or three dollars in silver, a finger ring, which had belonged to appellant, and also two checks payable to him, one for the sum of $35 payable to appellant, and dated on the day of the homicide, and another check for $4 executed by one Hocker to George Welch, and endorsed by him. The evidence also shows when found the $35 check payable to appellant was at the time endorsed by him. Appellant and deceased were seen by several parties on the day named in company with each other riding around in the neighborhood close to the place of the killing. About three o'clock on this day they were seen by one witness, at which time the deceased had on a pair of boots, evidently belonging to appellant, and appellant had on the shoes which undoubtedly belonged to deceased. About a half hour before the body of deceased was found, as stated by F. A. Waddell, appellant came to his house, near where the shooting occurred, and borrowed a Winchester gun from him, and stated that he wanted a gun to go deer hunting. Jim Waddell let him have the gun, in which at the time there were two cartridges. He returned with the gun just about dark, and said he had killed a man. Since under the contention of appellant the particular character of this statement becomes important, we will set out at length the testimony of the witnesses whose testimony relates to this matter. F. A. Waddell testified on this question as follows: "I saw Ed Welch again that afternoon, or evening, after dark; he just walked in, opened the door and stepped in with the gun in his hand, and he just said: 'Uncle, I have killed a fellow,' and I told him, 'Well, I guess not,' and he said, 'Yes, he is dead all right,' and I said, 'Where did you kill him?' and then he said, 'Up on Beef,' and I didn't know who it could have been, and said, 'I don't know who it could have been,' and then my wife said: 'Who is it that you have killed—Bill McCulloch?' and he said, 'No, it is that other God-damn son-of-a-bitch that stays up there.' And then Ed left us; he went out with the gun and started off with the same, and I 'hollowed' to him, and told him that I wanted the gun, and then I got the gun from him." Jim Waddell on this matter gave the following testimony: "I was present when he came back there, and I heard the conversation where he said that he had to kill a man. I was not in the house when he first came in, I was in the kitchen at that time. I heard him say what he said about it. He said that he hated to kill a man, and my father asked him

where he had killed him, and he said up there on 'Beef,' and mother said that it must be Bill McCulloch, and he said no, it is that other fellow that stays up there. He said that he hated to kill a man, but that he had to do so. He said that the fellow tried to get him, but that he finally got him. I walked out on the gallery at the time he was leaving our house. After the defendant had made the statement in our house, and he walked out on the gallery, I followed him out there, and out there he made more statements with reference to the killing. He said that that fellow tried to sell him an automatic pistol, and that he told the fellow that he did not have enough money to buy it with, and he said that he would sell it to him so damn cheap that he would think he had found it, and then he pulled out his purse and he grabbed it, that is, Tanner grabbed it; that was all the statement that I remember that he made about it out there on the gallery, and he then left right away." Mrs. F. A. Waddell, on the same matter, testified as follows: "I was at our home on the night that Ed Welch came in there; it was the night that Ben Tanner was killed, and I heard him make statement in regard to the killing, and it was made while he was in the house, our house; he said that he had to kill a fellow up on 'Beef,' and asked his Uncle Phil to go after him. His uncle said, 'Maybe you didn't kill him,' and he said, 'Yes, he is dead.' I told him that I guess it was Bill McCulloch, and he said it was not Bill McCulloch, but that it was that other fellow that stayed down there at McCulloch's. He said that he hated to kill a fellow, but that he tried to run it over him, and before he would be run over by him, he would kill him. He said that he had to kill a fellow, that is, he said that he hated to kill a fellow, but that before he would be run over he would kill him; I do not remember the exact words that were spoken there; he also said that he tried to get him first, but that he finally got him." Appellant in his testimony gave a statement much more in detail of the transaction, and his account of it, as taken from his direct examination, is in these words: "When we got down he pulled off the boots and threw them to me, and then I give him the shoes, and I put on the boots and was standing up, and he didn't quite have the shoes on, when he said to me, 'Kid, let me sell you a damn good automatic pistol;' and I told him that I could not afford it, and he said that he would sell it to me so cheap that I would think that I had found it, or that I would think that he had given it to me. He said that he would sell it to me so cheap that I would think that he had given it to me. I didn't ask him what he would take for it, when he told me that he would sell it so cheap. I told him that I would give him $5 for it, and he said you have not got any money, and I told him that I did have some money, and then I pulled out my purse, and he made a grab at it. I pulled a cartridge out with

it, out of my pocket. When I pulled out the purse and he made a grab for it, it was knocked out of my hand and I never did see it any more, nor did I ever see the cartridge that had fell out. When he grabbed at the purse, I asked him what did he mean? and he said, 'God-damn you, I will show you what I mean;' and then he made a stab at me with a knife, and then I jumped back and said, 'Don't you cut me with that knife,' and he said, 'God-damn you, I will cut your heart out.' And then I started for the horses. He hit me one time with the knife, and cut my clothes with same. I didn't have on a coat but two overshirts and an undershirt, and he cut through them all and just grazed the skin a little bit with the knife. I think that this all was done with just one lick ·with the knife. I had these shirts with me at the examining trial of this case; and I had them at court on the former trial of my case; they were out in the wagon. Since that time my house burned up and these clothes were burned with the house; this house was burned up when I was at Rock Springs at court (at the fall term, 1908), at the last time this case was called for trial—last term of court. When I saw that Tanner was after me with a knife I just jumped back, and when he saw that I was getting near the horse he just jumped back and started to pick up a rock. I had started for the horse before he picked up the rock. He saw that I was going to get the gun, and just as I got it he got a rock and started up with it. The horses were back about ten feet from where I was standing when he first cut me; when I had put on the boots and was standing up there, and when I started to get the gun, he jumped back about ten feet and there is where he got the rock, and when he just had gotten the rock he said, 'God-damn you, I will knock your brains out.' One side of this road there is the south side and the other the north side. I was on the south side of the road and Tanner was on the north side of the road. I got the boots on before he got the shoes on. He threw the boots to me, and I put them on, and was standing up, and he was sitting down pulling the shoes on, and we were about in this position when the conversation came up about the pistol. I had a purse with me, and when I pulled the same out he grabbed it. (Witness handed purse.) This is the purse that I had that day. He was sitting down pulling his shoes on, and when I pulled out the purse he just made a grab at it, and knocked it out of my hand. When he jumped and knocked this purse out of my hand, and I said, 'Tanner, what do you mean,' is when he said, 'God damn you, I will show you what I mean,' and then it was that he struck at me with a knife. He cut through my coat and two shirts, and just grazed the skin a little bit. I said, 'Tanner, don't you cut me with that knife,' and he said, 'God damn you, I will cut your heart out,' and then I went back towards the horse. The gun was on the horse, that is, the saddle, and when I

got to where the gun was, he saw that I was going to get it before he could cut me, and he went after the rock. ·He just went back to about where I was putting on the boots, and stooped down for the rock. He was then on the south side of the road, where I was at first when I was putting on the boots. And then I told him not to hit me with the rock. He was not entirely up with the rock when I shot him. I just shot one time, and when the bullet hit him he fell." This perhaps is a sufficient statement of the facts of the case to make the opinion understood. On the trial, which was stoutly contested, very many questions arose in respect to the admission and rejection of testimony, which we will discuss in order. We feel confident, however, that in respect to none of them was there any error committed by the trial court.

1. The first objection urged is to the testimony of Mrs. W. F. McCulloch. The State sought to prove, and was permitted to prove by her the position in which the body of deceased was lying at the time she reached it. This was objected to because the State had not shown by any testimony that the body had not been disturbed, and the position changed after the killing and before witness saw it. There was no error in the action of the court in this matter. In the nature of things, the State would not be called upon to establish a negative as a predicate for the introduction of testimony. Again, it was shown by other testimony that the body of deceased when seen by Mrs. McCulloch had ·been practically, if not wholly, undisturbed, and the evidence of other witnesses was introduced without objection showing without contradiction practically every fact, in respect to the position of the body, testified to by this witness.

2. The State introduced the witness W. F. McCulloch, and, among other things, asked him the following question: "Mr. McCulloch, please state which one of the wounds on Ben Tanner's body was the place of entry?" To this question, and the answer sought to be elicited thereby, objection was made for the reason it was leading, and because further the witness had not testified that he had ever before examined any wounds upon a human being. The witness had testified that he had had a great deal of experience in handling firearms, and in killing hogs and cattle, and had made frequent observations as to the appearance of wounds of entry and exit, and from such experience could always tell which was the wound of entry and which was the wound of exit. He further stated where the bullet entered it was smaller than where it came out. That on entering the bullet pushed the flesh inward, and where it came out it pushed the flesh with its ragged parts outward. It seems to us clearly that this witness had sufficiently qualified as an expert, and that the testimony was admissible. In this connection it should be stated that the testimony of. all the witnesses, including the physician, was substantially to the same effect, and leaves in our minds no doubt

that the wound of entry was the bullet hole in the back of deceased's head.

3.   While the witness W. F. McCulloch was on the stand, with a view of showing his friendliness to the deceased and his bias and interest in the case, and for the purpose of affecting his credibility as a witness, he was asked by counsel for appellant the following question: "Didn't you know when Ben Tanner was at your place the first time that he was a fugitive from justice?"   The bill recites that had he been permitted to answer the witness would have testified that he did learn from Ben Tanner shortly after he came to his house that he was, at the time, on the dodge, and a fugitive from justice, and would further have elicited from said witness the fact that notwithstanding his knowledge that Tanner was a fugitive, he kept him in his house.   This evidence was offered, in connection with the statement that McCulloch being a material witness for the State, and having testified to inculpatory facts against appellant, for the purpose of showing animus, bias and motive, and as effecting the credibility of the witness McCulloch.   The bill of exceptions on this question is approved with this qualification:   "There was no statement made to the court, nor was it in any way made known to the court, as recited in this bill, that the said witness would have testified that he knew the deceased was a fugitive from justice and on the dodge."   Whatever might be our conclusion in respect to this matter, in the absence of this explanation, it is clear that, as explained by the court, it is without merit.

4.   Equally without merit, as explained by the court, is the matter raised by the fourth bill of exceptions.   This proposed testimony also relates to the friendship or state of feeling between McCulloch and deceased.   In explaining the matter the court says that this witness afterwards stated that he was very friendly with deceased Tanner, and that in responding to the questions of counsel for appellant he thought that they were asking about Welch.   The testimony sought to be elicited was, we think, immaterial.

5.   While the witness McCulloch was on the stand, and after he had testified that on the morning of the killing when deceased left his house, that he saw him in possession of a pocketbook, similar to the one exhibited in evidence as being found near the body of the deceased, that before leaving the house he saw deceased take a dime out of the pocketbook and drop it back in his purse, and he heard it fall upon and clink against other money in the purse; that he did not know the amount of money in the purse, but knew there was other money in it, he was then asked upon cross-examination if he had not stated, at the body of deceased, on the morning after the killing, in the presence of W. P. Rose, and others, that he knew that deceased only had fifteen cents, and that five cents of that he was going to use to buy stamps to place upon letters to be mailed

by him for the wife of witness, and with the other ten cents he was going to buy tobacco from Bud Anderson; to which, as recited in the bill, the witness first answered, that he did not make such statement, and then stated that he did not remember making such statement. Thereupon W. P. Rose was introduced by appellant, and testified that said witness McCulloch did, at the time and place inquired about, make such statements. The bill further recites that upon cross-examination counsel for the State several times asked said witness Rose if he was not mistaken, and if the statement made by McCulloch was not that deceased had fifteen cents, and other money, but he did not know how much more he had. To which question the said witness Rose stated that that was not what McCulloch said, but that he had stated, as already claimed by the witness Rose, that he, McCulloch, knew that fifteen cents was all the money that deceased had, and the witness Rose further stated: "I know that is what he said, because I remember the conversation and the manner in which the question of deceased's money came up for discussion, and if you want me to, I can state that conversation, and show you why I know that I am not mistaken." To which State's counsel objected and said they did not want the conversation. The bill then recites that on redirect examination appellant's counsel offered to prove by said witness Rose as res gestae of said impeaching statement, the said conversation introductory of said impeaching matter, to which proposed evidence the State objected, because said conversation was not relevant and not res gestae, and the court sustained same. It will be noticed that the conversation referred to, the introductory statement of McCulloch, and which the witness states enables him to be sure that he is not mistaken, is not given. In this respect the bill is clearly defective, and in the absence of a statement of the purport or substance of the conversation, we would not be authorized to assume that it was material or of such character as to refresh the memory of the witness or to make more certain his testimony, nor could we tell from the bill whether it was res gestae or not.

6. The next bill complains of the action of the court in refusing to permit appellant to prove by Mrs. Waddell, a witness introduced by him on this trial, that she had been summoned as a witness for the State, and had on a former trial been placed by the State as a witness on the stand in its behalf. Referring to the statement of facts in the case, it appears that the cross-examination of this witness went only to prove relationship, and that she had given in her direct testimony the conversation in the way she heard it, but that she did not remember the exact words; that she had stated all she remembered. There was no effort of impeachment of the testimony of this witness, nor anything in the cross-examination or the record that would in any event have required or justified or even rendered valuable to appellant such support of this witness. Besides, it is

not believed it would have been proper to have supported the witness in the manner attempted.

7. Appellant complains that on his cross-examination counsel for the State were permitted to ask him the following question: "If your mother and your wife says, or testified, that you did not come back home from the time that you left that morning until about four o'clock, is that correct?" This it is urged was inadmissible for the reason that it is incompetent for one witness to testify as to the truthfulness or falsity of the testimony of any other witness; that the State is not permitted to refer to any evidence given at a former trial by any witness, except the one testifying, and then only for the purpose of laying a predicate; that the statement assumed in the question was not true that either the mother or wife of appellant had so testified; and, further, that the question was improper for the reason it contained a statement in the presence of the jury to the effect that the wife of the defendant had on a former trial made, as a witness, a damaging, inculpatory statement against him. The bill also recites, in connection with said objections, counsel for appellant tendered proof that the wife of appellant had not testified at all upon the former trial of the case. The bill thereupon recites that counsel for the State withdrew the question, and the court sustained appellant's objection, and orally instructed the jury not to consider said question for any purpose against appellant. This bill is approved with the following explanation: "When counsel for the defendant objected to the question asked defendant, counsel for State and defendant entered into a discussion about whether or not the defendant's wife had testified at the former trial at all, and, if so, what her testimony was in this matter, and the court refused to hear discussion on the matter, stating that the defendant's objection would be sustained. Whereupon counsel for the State · said they would withdraw the question, and requested the court to instruct the jury not to consider the matter for any purpose, which was done. Counsel for the State made no admission to the effect that the defendant's wife had not testified, as the question indicated, and counsel for the defendant did not request the court to so inform the jury, nor to inform the jury that the wife had not so testified, in the former trial of the case. The defendant's wife did testify on the former trial of the case, but what she testified to was not permitted to be stated nor was it offered to be proven by counsel for defendant." Under the explanation of the court there was no error committed of which appellant can complain.

8. The remaining bills of exception complain, in many ways, of the action of the court touching the examination of appellant as to the wounds inflicted on him by Tanner, the deceased. In this connection it should be stated that appellant testified that Tanner cut him across the breast with a knife, cutting through both his top

shirts and an undershirt and grazing the skin, causing him to bleed. This fact was denied by the State, and the truthfulness of appellant's statement vigorously assailed. No witness was produced by appellant sustaining this statement. The only fragment of testimony that in any way supports this statement is the evidence of Mrs. Waddell, who testified as follows: "I noticed his shirt that night, and noticed a place *torn* in the shoulder of his shirt. It was just a hole in his shirt there on the shoulder." He was asked to name what person, relative, officer or citizen to whom he had exhibited this cut place. He was asked whether at the examining trial his clothing were in the same condition they were immediately after the killing. He was asked if he had ever produced these clothes or offered them in evidence, and many similar questions. If this statement was true, undoubtedly it was an important fact in his favor. About the only way the State could question and impeach the correctness and truthfulness of this evidence was by cross-examination substantially along the lines adopted. If his statement was true it would have been an easy matter to have supported his contention by the testimony of other witnesses. If it were true, it was most natural that he should call attention to the fact to someone. In a matter so vital, the clothes themselves would have carried convincing proof in support of his statement. It seems to us that the testimony was so clearly admissible as to admit of no sort of doubt. It was not open, as the learned court below explained, to the objection that it was an allusion to the failure on the part of appellant to testify or make any statement at the inquest hearing, or indeed open to any other objection.

9. The next question to be considered, and, as we believe, the most important question, is one not free from difficulty. It was and is the question most insisted on in oral argument, which was presented on appellant's behalf with great earnestness, and ability. That question is the failure of the court, as claimed, to charge the jury the substance of article 675 (and subdivisions 1, 2, 3 and 5 thereof) of our Penal Code. This article, and the subdivisions named are as follows:

Art. 675: "Homicide is permitted by law when inflicted for the purpose of preventing the offense of murder, rape, robbery, maiming, disfiguring, castration, arson, burglary and theft at night, or when inflicted upon a person or persons who are found armed with deadly weapons and in disguise in the nighttime on premises not his or their own, whether the homicide be committed by the party about to be injured or by some person in his behalf, when the killing takes place under the following circumstances:

1. "It must reasonably appear by the acts or by words, coupled with the acts of the person killed, that it was the purpose and intent of such person to commit one of the offenses above named.

2. "The killing must take place while the person killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit such offense.

3. "It must take place before the offense committed by the party killed is actually completed; except that, in case of rape, the ravisher may be killed at any time before he has escaped from the presence of his victim, and except, also, in the cases hereinafter enumerated.

5. "If homicide takes place in preventing a robbery, it shall be justifiable if done while the robber is in the presence of the person robbed, or is flying with the money or other article taken by him."

From the statement above made the application and relevancy of this contention will be understood. We think it must be held, in fairness to appellant, that the question of robbery is, in a sense, suggested by the testimony. At the same time, it is not to be denied that all the evidence of robbery is inextricably connected in the testimony of appellant with the issue of either assault to murder or to do serious bodily injury, and the rights of appellant in firing the fatal shot are as inextricably interwoven and connected with his plea of self-defense. The court charged on the doctrine of self-defense, and the charge, as a submission of that issue, is not complained of. If the charge of the court submitted as well the facts and issue touching robbery, and the existence of the facts out of which robbery could be inferred, it would seem in reason that appellant would be without just cause of complaint. Now then, after instructing the jury in a general way on self-defense, and after applying the doctrine of self-defense to the facts in issue both as to an actual attack and threatened attack, including the doctrine of reasonable appearances of danger, and the right of appellant to be judged from his standpoint, in connection both with the acts and words accompanying same, considered in connection with the relative size and strength of the parties, the character of deceased, and all the other facts and circumstances known to the defendant, the court then thus instructed the jury: "Or, again, should you believe from the evidence that while defendant and deceased were discussing some matter about the sale or purchase of a pistol, the defendant took out his money purse, and that thereupon the deceased grabbed at the same or knocked it out of the hands of the defendant, and that upon the defendant remonstrating with or asking the deceased what he meant, the deceased rushed upon defendant and struck at him with a knife, and that defendant immediately ran to his horse, seized his gun and shot and killed said Ben Tanner, then, in case you so find, or if you have a reasonable doubt that such were the facts, or as to the fact that the deceased so attacked the defendant with a knife, you will acquit the defendant." If the issue of robbery or attempted robbery was in the case at all, it arose and is based on the existence of all the facts referred to in the court's charge, all of which occurred at the same time and as

continuous portions of the same transaction. It will thus be seen that under this instruction if the jury believed or had a reasonable doubt in their minds that while appellant and deceased were discussing the matter about the purchase of a pistol, appellant took out his money purse, and thereupon deceased grabbed same or knocked it out of his hands, and thereupon the defendant remonstrating with or asking him, deceased, what he meant, the deceased rushed upon defendant and struck at him with a knife, and appellant immediately ran to his horse, seized his gun and shot and killed Tanner, then in case the jury should so find, or if they had a reasonable doubt that such were the facts, or as to *the fact* that deceased so attacked defendant with a knife, they would acquit him. This charge applies the very facts relied upon by appellant. It is true, it does not in terms instruct the jury that appellant had the right to kill deceased if he believed that he was attempting to rob him, but it does instruct the jury that if the facts touching said robbery testified to are true, then appellant should go acquitted. It also, in another paragraph, instructs the jury that if deceased had picked up a rock, or defendant believed that he had, and was in the act of making an attack upon him, or if it so appeared to him at the time, and he shot deceased, he should be acquitted. This, we think, was quite as favorable a charge to appellant as he was entitled to receive under the law. The issue in fact of the robbery was based upon all the things done and said at the time. An instruction with reference to robbery disassociated from the facts would have been unnecessary and improper. The issue of robbery, if gathered at all from the testimony, is to be gathered from all the facts testified to by appellant. We think the charge, when examined and measured by the facts in evidence, contained such a submission of the case that the jury could not have misunderstood appellant's rights, and could not have been misled thereby, but on the contrary, when tested in its entirety, stripped of all legal phraseology, in a plain matter-of-fact way, directed the jury that if appellant took his money purse out of his pocket and deceased grabbed at it or knocked it out of his hands, and when appellant remonstrated with him and asked him what he meant, and deceased rushed upon him with a knife, and appellant immediately ran to his horse, seized his gun and shot and killed Tanner, he should be acquitted. Nor were the jury in this charge required to find either danger or reasonable appearances thereof. This was appellant's defense. These were the facts testified to by him. Considered as a whole, as stated, we believe the charge of the court is not subject to substantial criticism. In this connection it is to be noted that this statute has not often been construed by the court. The only case in which the matter has been considered, so far as we have been able to find, is the case of Smith v. State, 31 Texas Cr. Rep., 14. In that case Judge Davidson, who wrote the opinion, makes this

general reference: "Had Isbell fired the first shot, under the circumstances detailed, the defendant being in the perpetration of robbery, and had death ensued from the effect of such shot, such killing upon the part of Isbell would have been no offense against the law; because our statute expressly provides that if the homicide takes place in the prevention of robbery, it shall be justifiable if the robber is in the presence of the parties robbed, or is flying with the money or other article taken by him. Penal Code, art. 570, subdiv. 5."

10. The only remaining ground of the motion for a new trial is thus stated by appellant:

"The verdict of the jury in the case is contrary to, and unsupported by the evidence, in that it absolutely fails to disclose, or even to remotely suggest, any motive for the killing of Ben Tanner, other than that of self-defense, or in the prevention of robbery as shown by the defendant's own testimony, and the testimony of the State's witness, Dr. P. F. Robertson, whom the State qualified as an expert, both in the use of firearms, and as a physician, is positive and uncontradicted to the effect that he probed the wound in the back of the head and traced its course from the point of entry behind the right ear downwards several inches to the base of the skull; that it did not enter the base of the skull, and that in his opinion the two wounds, one in the top of the head, and the other one in the forehead, were made by the same bullet, which entered behind the right ear, and ranged downward to the base of the skull, and was there deflected and made the other two wounds, which evidence is entirely contrary to the State's theory that at the time of the killing deceased was on horseback and the defendant also on horseback, shot him from the rear, and is thoroughly consistent with and corroborative of the defendant's statement of the relative position of the parties at the time of the shooting, as is also the testimony of witnesses as to the finding of the purse and cartridge and the contents of the purse found at the feet of deceased." The case is indeed a singular one, and in view of the disparity of the age of the parties, proof of the bad character of Tanner, the deceased, and the lack of clearness of the testimony in respect to motive, we have been led the more carefully to examine the record. We do not believe, however, in view of the entire record, that we would be justified, sitting as a court of appeal, in reversing the judgment on this ground. It will be noticed by the statements heretofore given that the testimony of F. A. Waddell, Jim Waddell, Mrs. F. A. Waddell, and appellant does not wholly agree as to what was the statement made to them by appellant. The testimony of F. A. Waddell contains no suggestion of self-defense or other justification on the part of appellant. It contains such a reference to deceased as a "God damn son-of-a-bitch" as to furnish some evidence of hatred, malice and ill-will. The borrowing of the gun only about a half hour before the fatal shot is strangely at variance

with appellant's statement that the parties were intending to go deer hunting. Again, the evidence showed that on the first trial appellant stated that when he fired the shot which killed Tanner, that the "deceased was facing him and looking him in the face when he shot him;" that "the deceased was in the act of rising up and looking him in the face when he shot him." It is true that the force of this statement is somewhat broken by the cross-examination of the witness as to the meaning of appellant, and that he might have been facing him or had his side to him. It is the peculiar office and duty of the jury to ascertain and determine the facts in every contested case. The trial court should not hesitate, in a proper case where the jurors have not done their duty, to set aside their verdict. We would only be justified in so doing in a case where the verdict was without any evidence to support it. A careful review of the case has not convinced us that this is such a case.

Finding no error in the record, it is, therefore, ordered that the judgment of conviction be and the same is hereby in all things affirmed.

*Affirmed.*

[In this case appellant filed a motion for rehearing and pending said motion escaped, whereupon his appeal was dismissed December 1, 1909.—Reporter.]