CLARENCE CHANCE v. THE STATE.

No. 16150.   Delivered October 18, 1933.
Rehearing Denied February 14, 1934.
Reported in 68 S. W. (2d) 212.

The opinion states the case.

*E. R. Simmons* and *W. V. Geppert,* both of Teague, and *Howard Dailey,* of Dallas, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, thirty-five years in the penitentiary.

We first notice appellant's bills of exception. Bills 1 and 2 were correctly refused. Bills 3, 4 and 5 complain because the court declined to give special charges relating to the law of circumstantial evidence. These charges were fully covered by the main charge, and by the giving of special charge No. 7 requested by appellant. In these charges appears a lengthy exposition of the law of circumstantial evidence apparently as supposed by appellant to be applicable to the facts of his case. We see nothing in the case to call for a charge other than an application of the principles and announcements laid down by this court in cases too numerous to mention. We do not think any of the bills manifest error. It was not error for the court to charge the jury that appellant's co-indictees could not be legally used by him as witnesses in his behalf, complaint of which appears in another bill of exception. Nor do we think special charge No. 3, complained of in another bill of exception, was necessary to be given, the law of principals being fully covered by the admirable charge given to the jury. Another bill of exception sets out all of the exceptions taken by counsel for the accused to the court's charge. These have all been examined, and none of them appear to be well taken.

Mrs. Williams, wife of deceased, swore that she parted from her husband in Dallas, Texas, about eleven o'clock on the night before his dead body was found by a roadside in Freestone county, some 110 miles from Dallas, early the next morning. She said when he left her at Carlton's cafe he told her he was going to the Chance brothers apartment at 4625 San Jacinto Street in Dallas. Carlton, another state witness, at whose cafe Mrs. Williams and her husband parted that night, testified that when deceased left the cafe he said he was going to see Clarence Chance. Deceased called a taxi from J. B. Nichols Company to take him out there. Barnett swore that he drove a taxi for J. B. Nichols Company on January 23, 1933. Answering a call he picked up deceased about twelve o'clock midnight at Carlton's cafe and took him to the end of the 4500 block on San Jacinto Street, let him out and saw him cross to a brick apartment in the 4600 block, which he entered. This was the last time witness saw deceased. By his bills of exception 9 and 10 appellant complains of the admission of the testimony as to what deceased said about going to the Chance brothers apartment, and also going to see Clarence Chance.

In article 728, C. C. P., it is declared that, when a detailed act, declaration, or writing is given in evidence, any other act, declaration, or writing which is necessary to make it fully understood or to explain same,—may also be given in evidence.

In Upton v. State, 48 Texas Crim. Rep., 293, we held admissible a statement by one who brought and delivered a note, the statement being as to who sent the note, this being held admissible as part of the res gestae of the delivery of the note.  In Smith v. State, 104 Texas Crim. Rep., 103, we cited with approval the Upton case as sustaining the general proposition that statements made by a party to a transaction at the time, from which the character, motive and object of the transaction may be gathered, are res gestae.  Smith's case also cites Russell v. State, 11 Texas App., 295, and Stockman v. State, 24 Texas App., 392, as upholding the same doctrine.  See, also, Pharr v. State, 9 Texas App., 129; Fulcher v. State, 28 Texas App., 465; Wells v. State, 111 Texas Crim. Rep., 21; Filpot v. State, 114 Texas Crim. Rep., 278; Hunter v. State, 116 Texas Crim. Rep., 584.  In Stockman's case, supra, quoting from Mr. Greenleaf on Evidence, it is said:

" 'When an act is done to which it is necessary or important to ascribe a character, motive, or object, what was said by the actor at the time, from which the character, motive, or cause may be collected, is part of the res gestae,—verbal acts,—and may be given in evidence, whether the actor be or be not a party to the suit.'  (1 Greenl. Ev., sec. 108, and note on page 130; Williams v. State, 4 Texas App., 5; Sager v. State,. 11 Texas App.. 110; Pharr v. State, 9 Texas App., 129.)"

Deceased announced his intention of going, had a taxi called to take him, was taken to his destination, shown by other testimony to be the place where the Chance brothers lived, and the testimony of his statement as to who he was going to see was admissible as showing the motive of his going, and as fixing its destination and character, and same became thus a proper part of the res gestae of such going.  There is nothing in this record to bring the testimony objected to within the holdings of this court relative to testimony showing an undisclosed motive on the part of deceased.

By bill of exception No. 11 complaint is made of the admission of the testimony of the wife of deceased that "She knew it was Dudley Williams that the Chance brothers were charged with killing; that the paper did not give the dead man's name, but she knew it was him."  Without declining to consider this bill for the reason that it does not give enough of the setting or surrounding facts, we look to the statement of facts and quote therefrom what Mrs. Williams said in this connection: "It was on Tuesday, about 1 o'clock that I first learned that Dudley Williams was dead, that is, on January 24th, about 1 o'clock.  Jack Adams, a friend, 'had gone to their apartment,

and no one was there, and the Dispatch said they had the Chance Brothers down here in jail, and they described a dead man, and I knew it was him. It did not give his name, but I knew it was him.' When I learned about this from the Dispatch, I came to Fairfield, and saw the body of Dudley Williams over here at the undertaker's, I do not recall the name. My husband was dead at that time."

The ground of objection set out in the bill is that it was "a conclusion of the witness." In sections 131-132 of his Annotated P. C., Mr. Branch cites numerous instances in which opinions are held admissible under many holdings of this court. This woman said in the quoted testimony that the paper gave a description of a dead man, and she knew it was her husband. We have no means of knowing how full and accurate was the description given by said newspaper. It is not set out. That the deceased might have been so completely described as to make his identification easy and to entirely have justified the wife's statement that from the description she knew it was he, is unquestionably logical, and the admission of the testimony was not harmful. Mrs. Williams evidenced the accord of her conclusion with the facts by going to Fairfield that same day and there finding and identifying the slain man as her husband. We think the cases cited by appellant, including Roberts v. State, 260 S. W., 875; Wiggins v. State, 27 S. W. (2d) 236; Russel v. State, 45 S. W. (2d) 622, and other authorities cited, not in conflict with our holding.

It is urged that the evidence does not support the verdict. Under our statute and decisions the jury are made the exclusive judges of the weight of the testimony, as well as the credibility of the witnesses. The general attitude of this court toward this question is stated by Judge Ramsey in Welch v. State, 57 Texas Crim. Rep., 111, from which we quote: "It is the peculiar office and duty of the jury to ascertain and determine the facts in every contested case. The trial court should not hesitate, in a proper case, where the jurors have not done their duty, to set aside their verdict. We would only be justified in so doing in a case where the verdict was without any evidence to support it." See Bradford v. State, 88 Texas Crim. Rep., 122; Poye v. State, 89 Texas Crim. Rep., 182; Vogel v. State, 89 Texas Crim. Rep., 474; Tucker v. State, 91 Texas Crim. Rep., 538; Castle v. State, 94 Texas Crim. Rep., 364.

The dead body of Dudley Williams was found by a roadside in Freestone county very early on the morning of January 24, 1933. With a shot gun or shot guns his head had been shot into a pulp, his hat being shot off his head and into a bush

near by where the body lay; the lining was shot out of the hat and was in the same bush, and a number of twigs were shot off said bush, making apparently true the claim that Williams was manifestly killed while out on the ground. Several witnesses noted and so testified that the buttons in the front part of Williams' trousers were unfastened. A number of witnesses between the point of the homicide and Fairfield testified that they saw two cars pass their houses early that morning going from Fairfield toward the point where the body was found, this being in the direction of Young's mill. These witnesses uniformly said there were three men in a yellow wheeled sedan with a yellow wheel spare, and two men in a dark bodied Ford coupe which had no spare, but had a strap or straps hanging from the spare rack in the rear of the car. They all said the Ford coupe was in the lead as the cars approached the point of the homicide. At the place where the body was found a car appeared to have turned out to the right of the road going north, the tread of the tires on which plainly appeared in the sandy soil. Later during the day and after the arrest of appellant and his companions, the yellow wheeled sedan in which they were when arrested some five or six miles from the scene of the homicide, was brought back to where the body was found and its tread and track identified with the tracks of the car thus seen to have turned out of the road. Beginning at the point of the homicide and going further on the road toward Young, successive witnesses testified that they heard a number of shots, apparently four or five or six, coming from the direction of the place where the body was found. These witnesses observed two cars going toward Young, one a yellow wheeled sedan with two men in it, in front, closely followed by a dark bodied Ford coupe with a strap hanging down from the spare rack, this car also having only two men in it. A witness living nearest where the homicide took place said that immediately after hearing the shots fired he heard the roar of motors as the cars started, and in about three or four minutes the two cars mentioned passed his place in the order mentioned, having in them at this time only two men each. By various witnesses the two cars were traced driving rapidly toward Young, which was three or four miles from the scene of the homicide. At Young's mill several other roads branch off, one of them leading down toward Blunt. A negro who worked for Mr. Young testified that quite early that morning he saw a yellow wheeled sedan car, in which the parties were when arrested, a little while later, near the mail box by Young's store, they being about where the Young-Blunt road came to the store. These men accosted witness and wanted

to know of him if he could guide them through a sort of a by-road by Steward's mill, said road going west and in the direction of Dallas. This witness said he demurred, and told them he was working and could not go, but they twice told him to come and go and at last he went. He said they drove back toward Fairfield over the Young-Fairfield road, but soon began having trouble with the battery box which presently came loose. About this time a truck came along from the direction of Fairfield, and some of the party asked the truck driver to lend them a screw driver. He did so, and told the negro, whom he seemed to know, to leave the screw driver at Mr. Young's store. This negro further testified that his party in the yellow wheeled sedan then turned off the Young-Fairfield road and took the Steward's mill road, but that they began to have increasing trouble with the battery box. Clarence Chance, appellant, was driving. After a while this box seems to have come entirely loose and the party had to stop on a bridge where they were apprehended while trying to fix the battery. Appellant Clarence Chance and his brother Carl Chance, and the two co-defendants, Lonnie Sikes and Olen Tyler, were all present when the car was overtaken by the officers on this bridge. The officers found nothing in the car but a grubbing hoe. They took appellant and his party to Fairfield and put them in jail, and put the yellow wheeled sedan in the jail yard. They then started out to find the dark colored Ford coupe. They found it not so very far from Young's store where it had been driven through an old field and left in some woods where it was not visible from the road. The key was in the car and a strap was observed hanging down from the tire rack, and the engine was apparently still warm, the officers testifying that it started easily and was driven back to Fairfield where it was later observed by a number of witnesses who said that the two cars appeared to them to be the identical cars which they had observed on the Young-Fairfield road the morning of the homicide.

The yellow wheel sedan was later identified and claimed and taken by a sister of the Chance brothers, who was introduced as a witness for the defense, and on cross-examination testified that her two brothers drove away from their apartment on San Jacinto Street in Dallas in her yellow wheeled Plymouth sedan about four or four-thirty o'clock on the morning of January 24th, but that no one was with them at the time. It appears that the dark colored Ford coupe was afterwards turned over to a son of Mr. German of Dallas. Both these cars had Dallas licenses on them. Another witness, Mr. Clements, testified that he had a filling station in Corsicana, on the road between Dallas

and Fairfield, and that on the morning of the alleged homicide about 6:10 A. M. a man whom he described and said appeared to him to be Lonnie Sikes, or a man very much like him, came by his filling station in Corsicana and got four gallons of gas. He said this man seemed to be excited and attracted his attention because of that fact. He said there was another man in the car driven by this party who either was asleep or drunk, and was kind of lying over on the back of the seat. He also said he observed another car just across the street, but he did not identify the car or the occupants. He said this car drove off about the time the coupe came up.

Appellant did not testify or make any effort to show he was not along the Fairfield-Young road at or about the time of the homicide. Nor was any testimony offered on this point as to any of his party. He introduced a number of witnesses who testified they were at his apartment at various times between 12 and 4 o'clock on the morning of the 24th of January and that they did not see deceased there. These witnesses were shown by the testimony of the state to be in the main people of bad reputation for truth and veracity, bootleggers, etc. We have stated enough of the testimony to illustrate, we think, the soundness of our conclusion that this record is not without testimony upon which the jury might predicate a verdict of guilty. We do not think the record so bare of such testimony as to evidence that the verdict was the result of prejudice, or other motive than a fair consideration of the testimony.

Appellant presented to the court below his bill of exception No. 12 complaining of a statement in the argument of the state's attorney, claimed to be a reference to the failure of the defendant to testify. The court refused to approve said bill, and returned it to appellant with notation thereon of his disapproval, and then proceeded to prepare and file the court's own bill presenting his view of the matter complained of, which view directly contradicted appellant's bill, and set out the argument of the state's attorney, which contained no reference to the failure of the defendant to testify. Appellant then filed his bystander's bill, supported by the affidavit of three persons who state no more of their attitude toward, or relation to this case than to say in the jurat of their said affidavit that they are "Citizens of the State of Texas, * * * and bystanders in the court, present when the matters involved in this bill occurred." The state then filed five affidavits controverting said bystanders bill and supporting the bill of the court, and state in their affidavits that one of the "Bystanders" was the father and law partner of one of the defense attorneys; that such another by-

stander was also a law partner of the same defense attorney, and that the other of said three was a sister-in-law of another defense attorney. These statements in the affidavits filed by the state as to the attitude and relationship of the makers of appellant's affidavit to his bystanders bill, do not seem to be contradicted in any way. It appears plain that the bystanders bill of appellant was not authenticated or verified by the affidavit of three such bystanders as our law contemplates. We perceive no difference in the attitude of the one of a firm of attorneys actively engaged in representing a client upon his trial and the attitude of the other partners or members of the firm toward said case, and we have always held that the attorneys for the accused are not and can not be bystanders in the sense that word is used in this connection. Barrington v. State, 106 Texas Crim. Rep., 193; Keller v. State, 95 Texas Crim. Rep., 256; Hunt v. State, 89 Texas Crim. Rep., 89; Walker v. State, 88 Texas Crim. Rep., 389. It is the evident contemplation of our statute that parties brought forward as bystanders to contradict a bill of exceptions prepared and verified by the court, must themselves be free from any taint of interest in the matter of the case on trial. We quote with approval the language of Judge Sherwood in State v. Jones, 14 S. W., 947, as follows:

"(1) A 'by-stander' is 'one who stands near; one who has no concern with the business transacting.' Webst. Dict. But one of those who signed the bill in question was John S. Haymes, one of the defendant's attorneys. It is the primary rule for the construction of all statutes of this state that 'words and phrases shall be taken in their plain and ordinary or usual sense.' Section 6570, Rev. St. 1889. This statutory rule is but a declaration of the general rule on the subject. The object of the statute in requiring the refused bill to be signed by three by-standers, respectable inhabitants, etc., was doubtless to obtain to such a bill the signatures of disinterested spectators, and not those whose interests are at war with such an attitude of indifference. Adopting the recognized and usual meaning of the word 'by-standers,' it must be ruled that the bill in the case at bar was not signed as required by law, and therefore cannot be considered. (2) But could this obstacle be overcome, the result must be the same. The main dispute here is on the point whether the notes of Alfonza Snipes' testimony, taken at the preliminary trial, were read in evidence by Smith, or whether he simply used the notes to refresh his memory when testifying. In this particular the affidavits pro and con are in direct and irreconcilable conflict. In this unfortunate attitude

of matters, some reliance should be placed on the certificate of the special judge, which has evidently been prepared with care. Giving to this certificate those favorable presumptions which always attend the acts of those acting in a judicial capacity, we shall rule that the bill of exceptions was not correct in its statements, and therefore cannot be regarded as preserving the matters purporting to be therein contained."

It follows that we are of opinion that the so-called bystanders bill No. 12 of the appellant can not be considered by us, and that we must accept as correct the recitals of bill of exceptions No. 12 as prepared by the court. Under the court's bill there was no reference by the prosecuting attorney to the failure of appellant to testify.

Believing the record in this case to not manifest any error, and that the appellant has had a fair trial, the judgment will be affirmed.

*Affirmed.*

### ON APPELLANT'S MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant requested the court to instruct the jury that his coindictees, Carl Chance, Lonnie Sikes and Olen Tyler would not be permitted to testify as witnesses for appellant even if they desired to do so. The court declined to give such instruction, and appellant complained of its refusal. By appellant's motion for rehearing our attention is directed to the fact that we said in our original opinion, inadvertently, "It was not error for the court to charge the jury that appellant's coindictees could not be legally used by him as witnesses in his behalf." What we intended to say was that it was not error for the court to decline to charge the jury that appellant's coindictees could not be legally used by him as witnesses in his behalf. The opinion has been corrected to read as it was originally intended. Article 711, C. C. P., prohibits persons who are indicted as principals, etc., from being used as witnesses for one another, but provides that if they are desired as witnesses by the accused a severance may be claimed, and if an acquittal of the one sought as a witness should result, then such party may testify in behalf of accused. It does not appear from the record that appellant sought to avail himself of a severance under the provisions of said article. It appears from the record that some of the parties named were brought into the court room for the purpose of identification, but it is not shown that counsel for the state sought any advantage by criticising appellant for not using them as witnesses; if so, another question would have been presented. (See Grille v. State, 112 Texas

Crim. Rep., 561, 17 S. W. (2d) 833, and authorities therein cited.)

In our original opinion we said that on the same day of the arrest of appellant and his companions a comparison of the tread and tracks made by the yellow wheeled sedan was made with those which had turned out of the road where deceased's body was found. This comparison was made a day or two after the arrest, and the original opinion has been corrected to so state.

We remain of the opinion that the questions presented by the bills of exception were properly decided originally, and that a further discussion of them would be but a repetition.

It was so earnestly urged on motion for rehearing that the evidence was insufficient to support a conviction that the present writer has again read every word of testimony contained in two hundred and thirty pages of typewritten statement of facts. Manifestly, it is impracticable to group all the facts in an opinion without extending it to unreasonable length. The facts were analyzed and the more salient ones mentioned in our original opinion. A re-examination of the evidence leads us to the same conclusion reached upon original submission. Where there was conflict in the evidence the verdict reflects that the jury settled it in favor of the state. We have no authority to say the jury was wrong in so doing under the facts presented.

Finding nothing upon which a rehearing may properly be predicated, the motion is overruled.

*Overruled.*