## JUANITA ELIZABETH BARR V. THE STATE.

No. 22229. Delivered December 9, 1942.
Rehearing Granted May 5, 1943.
Rehearing Denied June 23, 1943.

The opinion states the case.

*Hughes & Monroe,* of Dallas, for appellant.

*Dean Gauldin,* Criminal District Attorney, and *Chas. A. Pippen,* Assistant Criminal District Attorney, both of Dallas, and *Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

Under an indictment charging that appellant killed and murdered Blanche Woodall, with malice, appellant was convicted of murder without malice and her punishment assessed at four years' confinement in the State penitentiary.

About eight o'clock on the evening of Saturday, April 12, 1941, appellant drove to the home of the deceased, carrying with her, in a purse, a bottle of whisky and a .38 caliber pistol. The deceased was not at home. The maid advised that she would soon return. Appellant waited for her awhile, during which time she drank some of the whisky. She left, advising the maid that she would return later. A short time thereafter, appellant and deceased entered the house together. The inference is that appellant met the deceased as she was leaving the house and returned with her. The two remained in the house together from that time until the homicide occurred about 11:00 or 11:30 p. m. During this time, the two drank whisky and more was ordered sent in. Among the things transpiring between them was that the deceased dressed the hair of appellant, powdered and roughed her face, and put "eye-shadow" under the eyes. The maid said that appellant suggested to her: "We are all right, you can go see about the kids"; whereupon she left the room, believing that they wanted to talk over something which they did not want her to hear. The sole occupants left in the room were the appellant and the deceased. The maid had been out of the room about ten minutes when she heard a pistol shot and a woman scream, followed by another shot. She rushed to the room and met appellant coming out. She inquired of her what had happened, to which appellant made no reply. But, upon being told by the maid that she was going to call the police, appellant replied: "No need, I am going to do the same thing to myself." With this statement, she left the house. The deceased was found lying upon the floor, with two bullet wounds in her body, one having entered at the corner of the left eye and passing across and through the right eye. Around this wound was a gunshot powder burn, about the size of an orange. The other was in the back of the head. No powder burns were around it.

The testimony further showed that, after the shooting, appellant drove to a downtown cafe, where she delivered the pistol to her husband, who in turn delivered it to the proprietor of

the cafe and in whose possession it was found the following day by the officers. After delivering the pistol, appellant drove to a tourist camp, where she obtained quarters, registering under an assumed name. She was located in the tourist camp, the next morning, by peace officers, and to whom she gave still another name, denying that she was the appellant. After some questioning, she finally admitted her identity.

The foregoing constitutes a brief statement of the State's case and shows a killing, both unjustified and unexplained.

The defensive theory was that, for some time prior to the homicide, the husband of appellant had been keeping company with the deceased, and that, at various times, they were seen together in public. The State made no contest of this fact. According to appellant's testimony, she first became acquainted with such fact about eight months prior to the killing; that she remonstrated with her husband about such conduct, and each time he would agree to discontinue such relationship. It appears that the deceasd was contacted about the matter, and that she also agreed to discontinue, but that, at a later date, she told appellant that she was not going to give up the husband. Appellant charged that the affair between the husband and deceased was illicit. According to appellant's testimony, she decided to give the husband a divorce. About two weeks prior to the homicide, the husband moved out and took a room at a local hotel, where he continued to reside. He left some of his clothing at the home and in appellant's possession. On the day preceding the homicide, he went by the home and changed clothing, leaving his suit, with the request that appellant send it to the cleaners. Appellant said that, on the morning of the day of the killing that night, she went to get the suit to send it to the cleaners, as requested, when she found, in the pocket of the suit, a letter, which was undated and addressed to "My dearest," and signed "Mrs. Kelly." This letter was in endearing terms, and professed her love for "Eddie" (the husband's given name). Also, this letter referred to, and appeared to be written to, "Mr. Kelly." Appellant said that her husband and deceased referred to each other as "Mr. Kelly" and "Mrs. Kelly." It is interesting to note that proof of the fact that this letter was written by the deceased depends solely and alone upon the uncorroborated testimony of the appellant. The husband did not testify as a witness in the case, nor was the handwriting identified as that of the deceased. Appellant said that, upon finding this letter, she was heartbroken; that, from the letter, she got the idea that deceased was preparing to leave with the husband; that she

decided to go and see the deceased, with a view of frightening her into leaving the husband alone; that, with this in mind, she left her home, carrying with her a pistol; that, when she arrived, the deceased was not at home; that she waited for her to return and was preparing to leave when she met the deceased; that they went into the house, where she told deceased of her having found the letter; that deceased admitted having written it, but denied that she and the husband were preparing to go away together, saying that she had not seen the husband for days, and that it was all over between them. Appellant said that the deceased then suggested that she use more "make-up," as her husband liked it, and that ,as a result of this advice, the deceased did fluff her hair, powder and rouge her face, and put on eye-shadow; that she was preparing to leave when the telephone rang in an adjoining room; and, as to what then happened, we quote, from the appellant's direct examination, as follows: "I then started to get up to leave and the telephone rang and she got up to answer it—I was standing there by her - - - I pulled this pistol out - - - -it was Eddie on the 'phone. I said, 'Let me talk to Eddie' - -, and she said, 'Call me back later, Mr. Kelly' and hung up - -, and I pulled this (indicating pistol )out - - - and - - I don't know, - she grabbed my arm - - - I don't know what happened - - Oh, - Oh, I don't know what happened.

"When Mrs. Woodall told me that she was not seeing Eddie or talking to him on the telephone and that she was through with him, I tried to believe her because I wanted to believe her - - - then - - - - I heard his voice on the 'phone and I knew it wasn't so.

"I do not know how many times that gun went off - - - - - - - I am trying to compose myself.

"As to what I said to Mrs. Woodall when she hung the 'phone up and I pointed the pistol, I don't remember; I think I said, 'I came here to frighten you if you were not telling the truth about this letter'; and she grabbed at the pistol. I don't know what hand I had the pistol in or how I had it; I don't know what happened there. I don't know whether she had hold of the pistol at the time it went off or hold of my arm.

"I did not intend to kill Mrs. Woodall."

On cross-examination, the appellant was more indefinite relative to what transpired just before and during the shooting. She just did not remember.

A further statement of the defensive theory is not deemed necessary, except to say that there was testimony tending to show that appellant was temporarily insane at the time of the killing. In rebuttal of the defensive testimony, the maid testified that the telephone did not ring, and that no telephone conversation was had, as testified to by the appellant. Under the foregoing facts, the cautious trial judge submitted, as affirmative defensive theories, temporary insanity, self-defense, and accidental homicide. The issue of suspension of sentence was also submitted.

The extended statement of the facts is deemend pertinent in view of the question presented for review, in approaching a discussion of which it is well to keep in mind that the law does not justify the wife in killing the husband's paramour just because of such relationship. So, in this case, the facts tending to show that the deceased and the husband were guilty of illicit relations, afford no justification or excuse for this killing. Evidence of such relation was for the jury's consideration in determining whether the killing was with or without malice.

During the trial of the case, the State contended that the husband was, what might be termed, a "man about town"; that his illicit conduct was not limited to the deceased only, but that he was guilty of such relations with others; and that the appellant knew of such fact. The appellant denied that she knew of any such other relations on the part of the husband, and asserted that none existed.

A sister of the appellant testified in her behalf with reference to a conversation she had with appellant relative to the conduct of the husband and deceased. Upon cross-examination of the witness, the State asked her if, in such conversation, the appellant had not said to her: "maybe it will pass over as with the other women." The witness denied that the appellant made any such statement. She was then asked if she had not so testified before the grand jury during its investigation. The witness denied that she had so testified. Under such facts and predicate, the State introduced impeaching testimony showing that the witness did testify before the grand jury that appellant made such statement. No objection was urged to this testimony. Appellant insists, however, that such testimony, being impeaching only, should have been limited before the jury to that purpose. The trial court refused to limit such testimony and appellant reserved proper exceptions to his ruling.

It is contended that the charge was called for under the well-established rule that, if impeaching testimony could be used by the jury for purposes other than impeachment, so as to exercise a strong, undue or improper influence with the jury as to the main issue, injurious and prejudicial to the accused, the charge must limit it so that no unwarranted results would ensue. See Branch's Ann. Tex. P. C., p. 118, sec. 188; 22 Tex. Jur., p. 946, sec. 254. Unless impeaching testimony comes within the rule stated, no necessity exists for its limitation. Branch's Ann. Tex. P. C., p. 120, sec. 189. Under the facts here presented, whether the husband was or was not guilty, within appellant's knowledge, of illicit relations with others than the deceased, could have had no effect upon whether the appellant killed the deceased, while temporarily insane, or in self-defense, or whether the killing was accidental. These being the affirmative defensive issues, the impeaching testimony did not come within the rule requiring same to be limited before the jury. Moreover, the impeaching testimony could have been appropriated by the jury adversely to the appellant only in determining that the killing was with malice, rather than without malice. That it was not so appropriated or used by the jury is made evident by the fact that the appellant was found guilty of murder without malice. The conclusion is reached that the trial court did not err in refusing to limit such impeaching testimony.

Complaint is made because the trial court refused to submit the law of aggravated assault. It is insisted that the testimony of the appellant that she did not intend to kill the deceased, taken in connection with her further testimony that she carried the pistol with her when she went to the home of the deceased, for the purpose of frightening her, is sufficient to require the submission of aggravated assault. The instrument with which the deceased was killed, being a pistol, was a deadly weapon per se; the use made thereof was by shooting the deceased in the head. Under such circumstances, the law presumes an intent to kill. Art. 45, P. C.; Cade v. State, 258 S. W. 484, 96 Tex. Cr. R. 523; Collins v. State, 299 S. W. 403, 108 Tex. Cr. R. 72; Hadnot v State, 7 S. W. (2d) 566, 110 Tex. Cr. R. 109; Rodriquez v. State, 19 S. W. (2d) 47, 113 Tex. Cr. R. 160; Franklin v. State, 128 S. W. (2d) 389, 137 Tex. Cr. R. 136.

The intent to kill being presumed, the issue of aggravated assault was not raised

It is insisted that appellant was entitled to have the jury instructed to the effect that she had the right to go to the home

of deceased to seek an explanation of deceased's conduct towards her (appellant's) husband. Such a charge was unnecessary, because the trial court gave an unqualified charge upon self-defense and in no manner placed any limitation upon appellant's rights by reason of her presence in the home of the deceased or that she was armed with a pistol on the occasion of the homicide. Branch's P. C., Sec. 1950; Bozeman v. State, 215 S. W. 319, 85 Tex. Cr. R. 653.

The charge as given, covering the defense of temporary insanity and accidental killing, was adequate and sufficient under the facts. Appellant's contrary contention is overruled. In approving said charge, we are not to be understood as holding that the facts required a charge on temporary insanity or accidental killing. That question is not before us and is not decided.

The questions we have discussed are those presented by appellant in her brief and supported by able oral argument. We have, nevertheless, examined the other bills of exception in the record and they are overruled without discussion, as no error appears therein.

From what we have said, it follows that the judgment of the trial court should be affirmed, and it is so ordered.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

BEAUCHAMP, Judge.

The propositions of law stated in the original opinion are sound and supported by the decisions of this Court.

The troublesome question, presented in a different way on motion for rehearing, is whether or not the evidence as to the statement made by Evelyn Proctor before the grand jury should be restricted by the court in his charge so that the jury may consider it only for impeachment purposes. The State offered this testimony on the ground that it pertained to a material issue in the case. It would not have been admissible for impeachment purposes upon an immaterial issue. The appellant at the time so considered it because no objection was made to its introduction.

Throughout the trial, the State sought to show Eddie Barr's association with other women as an important fact bearing on the appellant's defensive theory. It could not have any effect unless she had some knowledge of it and the State tried through cross examining the accused as well as several of her witnesses to show such knowledge. It appears that the prosecution was having some difficulty in bringing this knowledge home to the accused. When Evelyn Proctor, the sister of appellant, was testifying in her behalf, the State asked her on cross examination if appellant had made a statement regarding Eddie Barr's relationship with deceased for the purpose of showing her knowledge of the other affairs. The witness denied that her sister had made any statement which included other similar troubles, whereupon she was asked by the State if she had not given certain testimony before the grand jury so indicating. This she denied and the evidence before the grand jury was reproduced, in accordance with the predicate laid that the witness had quoted her sister as having said, "Oh, well, maybe it will pass off as these other affairs have passed off."

It occurs to the writer that in order for us to say that the many love affairs of Eddie Barr with other women could have no effect on the mental status of appellant at the time of the homicide, we must reach such conclusion as a phychological fact. It may be that the often and prolonged wounding of one's feeling, or the attendant disappointment, heartaches, or whatever result might be inflicted upon the person, is in fact an individual matter. One may react differently to what another would. We are aware of no rule by which we may determine whether or not it made this party, under the circumstances, react to a repeated occurrence differently to what she would had it been the first one about which she had any knowledge. It may be that in some cases, or perhaps all, a wound on a sore spot would be more painful and less endurable than it would for the first of such injuries. In this event, proof of her knowledge of his love affairs with others than the deceased would be helpful and no error would result.

However, it appears to have been the theory of the State that it could thereby show a calloused affection such as would not be sensitive to the conduct of deceased in associating with Eddie Barr and thus make less reasonable her story of temporary insanity produced by the telephone conversation between deceased and her husband. The State's theory may be correct and, if so, the evidence of what took place in the grand jury room would be admissible only so far as it had the effect of im-

peaching Evelyn Proctor and should have been so restricted by the charge. If the availability of this testimony to refute appellant's story of what occurred is in doubt, based on the question as to its effect on her mind under the circumstances, then she is, as a matter of law, entitled to the benefit of that doubt. Citation of authorities on the subject would seem to be unnecessary with this conclusion of fact, for it is thoroughly settled that a limiting charge should be given with reference to evidence to impeach a witness or impair his credibility where such evidence could be considered by the jury for any other purpose. 42 Tex. Jur. p. 134, secs. 98—99; 22 Tex. Jur. p. 946, sec. 254. As a more specific discussion, we quote the following from 24 Tex. Jur. p. 582, sec. 98:

" 'Where it is apparent that the testimony can be used for no other purpose than that of impeachment, it is not necessary for the court to limit the purpose of the same in its charge.' If, however, the evidence may be used otherwise— either as an incriminating fact or to exercise a strong, undue or improper influence upon the jury as to the main issue, injurious and prejudicial to a party—the court should restrict its effect so that no unwarranted results may ensue. Such an instruction should be given even though at the time of its admission, the court verbally limited the effect of the evidence."

The author refers to a long list of decisions of our court to substantiate this statement. See also Paris v. State, 31 S. W. 857.

The conclusion in the original opinion that it could have no bearing on the issue of self-defense or on the issue of accidental homicide is correct but, on the issue of temporary insanity, if such issue be raised by the evidence, the rule would seem to apply. The State is not now in position to say that the issue of temporary insanity was not in the case, for it had fully recognized such issue and sought to produce much evidence to meet it. Had this not been so, the defense would, in all probability, have objected to some of this as prejudicial and succeeded in excluding it.

For the error in refusing to restrict the evidence of what Evelyn Proctor said in the grand jury room to impeaching purposes, the motion for rehearing is granted and the cause is reversed and remanded for a new trial.

ON STATE'S MOTION FOR REHEARING.

GRAVES, Judge.

It is suggested by the State that testimony to the same effect as that of the grand jury statement of Evelyn Proctor was admitted without objection, and that therefore the admission of Evelyn Proctor's statement before the grand jury would not be error.

The admitted statement referred to was that of Mrs. Curt Parnell, who testified that appellant's husband phoned appellant while at Mrs. Parnell's home, and told appellant that "he didn't care a rap about Blanche Woodall, that he was in love with her, Juanita, and that she could forget about Blanche Woodall, and that Blanche Woodall did not mean any more to him than anyone of a hundred other women he ran around with."

The above quotation is contended to be practically the same statement as that made by Evelyn Proctor before the grand jury. The great difference seems to us to be that the objected to statement purported to come from the appellant herself, while the just above quoted statement was made by the errant husband to appellant, and while it might have by implication meant that he ran around with many women, it is not evident therefrom that appellant knew of such derelictions upon Eddie Barr's part. We do not think the desired rule has application here.

We see no reason of further comment herein. The opinion on appellant's motion for a rehearing has the earnest attention of this court, and the conclusions therein set forth represent both thought and research. We see no good reason to recede therefrom.

The State's motion for a rehearing will be overruled.