Raymond D. **CORBETT,**
Appellant,

v.

The **STATE** of Texas, Appellee.

No. 45901.

Court of Criminal Appeals of Texas.

May 1, 1973.

Rehearing Denied May 23, 1973.

942

W. N. Shaw, Freeport, for appellant.

Ogden Bass, Dist. Atty., and Billy M. Bandy, Asst. Dist. Atty., Angleton, and Jim D. Vollers, State's Atty., and Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

DAVIS, Commissioner.

Appeal is taken from a conviction for murder with malice. Punishment was assessed by the jury at life.

A review of the testimony is deemed necessary in order that appellant's contentions may be discussed with greater clarity.

Terry Simmons testified that on the evening of January 26, 1970, he learned that appellant was in LaMarque and wanted to see him. At approximately 7:00 P.M., the two met, and appellant asked Simmons to drive him to Freeport, a distance of about forty miles, for appellant to procure a pickup truck.

Simmons testified that, as the two drove in the direction of Freeport, appellant described to him the events of the day. Appellant and his employer, the deceased, T. E. Smith, had argued at appellant's home, where Smith occupied a rented bedroom. They had argued about some checks that appellant had written and Smith had called the bank about the checks and threatened to send appellant back to jail.

While Smith was talking on the telephone in his bedroom, appellant related to Simmons, he hit Smith on the back of the head with a piece of pipe. He told Simmons that he had hit the deceased numerous times until Smith's body stopped moving, that Smith had fallen on the bed, and that he had left the body hidden in the bedroom and secured the door. He then drove deceased's pickup truck away from the house, parked it, and got a ride to LaMarque.

Simmons testified further that appellant wanted Simmons to help him find someone to dispose of the body. Simmons replied that he would think about it.

When the two arrived at Freeport at about 9:00 P.M., appellant led him to Smith's pickup truck. Some twenty minutes later, appellant and Simmons drove the two vehicles back towards LaMarque. Simmons recalled that it was a very foggy night, and before they arrived back in LaMarque, appellant stopped the pickup truck on a bridge ahead of Simmons and threw something over the railing. Simmons could not see what appellant threw away.

When they arrived in LaMarque, they both drove to Simmons' house. Appellant called his wife and departed. Simmons told his wife what appellant had told him, and it was decided that Simmons would go to the police. He first called for Chief Feigle at 11:00 P.M., but he did not reach Feigle until 3:00 on the morning of the 27th. They talked for about an hour, and Feigle then telephoned Chief of Police Lassiter in Freeport and advised him that the body of T. E. Smith could be found at a particular address in Freeport. Feigle related that an informant had told him that appellant had killed the deceased at that location (appellant's home) and that appellant would be back later in the day to dispose of the body. Appellant was supposed to be driving the deceased's pickup truck, armed, and he had made the statement that he would not go back to jail.

Chief Lassiter drove by the address, and then went to the police department, where he was joined by another police officer. The two then drove back to appellant's house, where they observed a light burning. They drove around the area for a short time and returned to the police department and called a telephone number listed in the name of the deceased at the same address. There was no answer, and the two men then drove to the address and, finding the front door unlocked, walked in.

In the back bedroom, they found the body of deceased under a pile of bedclothes.

They immediately departed the premises, taking nothing and disturbing nothing, and Lassiter went immediately to the home of District Attorney Bass and conferred with him. Between 6:30 and 7:00 A.M., a police surveillance was established at appellant's house.

At approximately 10:00 A.M., Lassiter and Bass went to appellant's house, again entering through the front door. They observed the body and departed.

At 11:30 A.M., the officers in the surveillance observed appellant drive up to his house in the deceased's pickup truck. He was observed "walking" a large wooden box into the side door of the house and immediately thereafter he carried in a wooden lid. The officers then heard hammering noises from within the house, and several times during the next half-hour, appellant appeared at the door and looked outside in all directions.

Sergeant Williams, of the Freeport Police Department, testified that shortly after 11:30 A.M. he observed appellant departing the premises in the deceased's pickup truck, and Williams and another officer followed appellant in an unmarked police vehicle until appellant parked the truck in a shopping center parking lot some distance away. The officers, both of whom were in civilian clothes, parked behind the truck and, with weapons drawn, identified themselves as police officers and arrested appellant as he exited the pickup. After he was handcuffed and placed in the police car, the two officers searched the truck and found a .38 revolver.

At some time in the early afternoon, appellant accompanied the District Attorney and several police officers back to his house, and the group entered the house, proceeded to the back bedroom and found the body of T. E. Smith sealed inside the wooden box.

At this time, the house was searched, photographs were taken, and several items were removed from the house including bloodstained tiles from the floor of the closet in the back bedroom. Other officers entered the house again later in the afternoon in the course of the investigation.

At no time did the District Attorney or any of the officers involved in the investigation ever obtain or attempt to obtain a warrant for appellant's arrest or a warrant for the search of appellant's house.

Several witnesses, including the wife of the deceased and employees of the First State Bank of Hitchcock, testified concerning checks by T. E. Smith made payable to appellant, which checks appellant had cashed and attempted to have cashed in the week preceding Smith's death. Mrs. Smith testified that on January 26, 1970, her husband, from whom she was separated, discovered in his bank statement two checks to appellant that Smith claimed he had not written.

Louis Boatright, Vice President of the Bank of the Mainland, in LaMarque, testified that at about 11:30 A.M. on January 26, 1970, he received a telephone call from T. E. Smith. In the call, Smith sounded excited, and he instructed that the bank should not "honor any checks by Raymond Corbett" and, as Boatright attempted to clarify Smith's message, he heard Smith talking to another person to the effect that "I am on the phone to Mr. Boatright at the bank at this present time." Before Boatright could ask Smith to clarify his message, he heard Smith say, "I am going to have your ass put in the pen," at which time the call was disconnected.

Records of the telephone company were introduced to show that a call had been made from T. E. Smith's telephone to the Bank in LaMarque at 11:32 A.M. on January 26, 1970.

Appellant's first contention is that any and all entries into his home by the authorities, on January 27, 1970, were warrant-

less searches, without his consent, not incident to his arrest and, therefore, unreasonable in violation of his rights under the Fourth Amendment of the United States Constitution and Article I, Section 9, of the Texas Constitution, Vernon's Ann.St. Appellant's motion to suppress evidence obtained in the searches was overruled after a pretrial hearing. Objection was made to introduction of such evidence during the course of the trial.

We look first to the initial entry by the Chief of Police and another officer at 6:00 A.M. Appellant contends this was a search without justification under the known exceptions to the constitutional requirement of a warrant for authorities to enter and search one's home. He relies upon the authority of numerous cases [1] in which this Court has held that warrantless searches cannot be conducted even with sufficient probable cause absent some exigent circumstances such as the imminent possibility of destruction or removal of the evidence or contraband. The facts of this case focus our attention on the possible applicability of the "emergency rule" discussed by this Court in Brown v. State, Tex.Cr.App., 475 S.W.2d 938. Appellant contends the present case is distinguishable from Brown v. State, supra, in that the officers entering the Brown home did so with the consent of the defendant and his uncle, and the original entry was, therefore, lawful because of that consent. While we agree that this distinction exists, the instant case is not at odds with Brown if the original entry and search for the body were justified under the emergency rule.

The emergency doctrine has developed as the courts have realized that the practical need for quick response by public officials sometimes outweighs even the imposing right of citizens to privacy and protection from unreasonable (warrantless) searches and seizures.

In Wayne v. United States, 115 U.S. App.D.C. 234, 318 F.2d 205 (1963), the police broke down a door to enter a room in which had been reported there was "an unconscious person." Justice Burger, in dealing with the conditions in which the police could properly enter a dwelling without a warrant, wrote in Wayne v. United States, supra:

"Breaking into a home by force is not illegal if it is reasonable in the circumstances . . . . But a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act,* not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response."

In United States v. Barone, 330 F.2d 543 (2d Cir. 1964), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053, the officers, on the street at 1:50 A.M., heard a woman's screams emanating from a second floor apartment. They entered the build-

1. Simpson v. State, 152 Tex.Cr.R. 481, 215 S.W.2d 617; Williamson v. State, 156 Tex.Cr.R. 520, 244 S.W.2d 202; Harbor v. State, 116 Tex.Cr.R. 31, 31 S.W.2d 650; Billups v. State, 116 Tex.Cr.R. 63, 31 S.W.2d 821; Coats v. State, 108 Tex.Cr.R. 298, 1 S.W.2d 288; Morris v. State, 115 Tex.Cr.R. 554, 27 S.W.2d 188; Smith v. State, 139 Tex.Cr.R. 251, 139 S.W.2d 791; Tarwater v. State, 160 Tex.Cr.R. 59, 267 S.W.2d 410; Gonzales v. State, 131 Tex.Cr.R. 15, 95 S.W.2d 972; Davis v. State, 113 Tex.Cr.R. 421, 21 S.W.2d 509.

ing, knocked on the door of the apartment, and answered "police," when a male inside asked who was knocking. After repeating their identity several times, the door was opened by two women who offered no explanation for the screams. The officers heard a toilet flush and, upon observing a man exiting the bathroom, one officer entered the bathroom and found pieces of counterfeit currency floating in the commode.

The policemen were found to be lawfully on the premises and, citing Justice Burger's opinion in Wayne, Justice Lumbard wrote:

"Indeed it is obvious that had the patrolmen been denied entry to the apartment they would have had the right, if not the duty, to gain entry forcibly."

In Wayne, Justice Burger said, "(t)he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." 318 F.2d at 212. Several courts have discussed the emergency rule in cases where police entered the premises after receiving reports of a homicide at that location, including this Court, in Brown v. State, supra.

In Stevens v. State, Alaska, 443 P.2d 600, which this Court cited in Brown, the defendant's neighbor reported a possible homicide to the police, and officers were admitted into the house by the defendant's wife. Again, the issue was whether their entry afterwards in the investigation was proper.[2]

The appropriate question for the instant case was raised in Patrick v. State, Del., 227 A.2d 486, where no one in authority consented to the police entry. There the victim and the defendant shared an apartment. It was the victim's employer who

discovered the crime, and when he telephoned the police, he was unable to determine whether the victim was dead or alive. The Supreme Court of Delaware approved of the police response and entry to investigate the possible homicide and said:

"The general rules governing searches and seizures are subject to the exception of emergency situations, sometimes called the 'exigency rule.' The reasonableness of an entry by the police upon private property is measured by the circumstances then existing. The right of police to enter and investigate in an emergency, without an accompanying intent either to seize or arrest, is inherent in the very nature of their duties as peace officers, and derives from the common law. United States v. Barone (C.A.2) 330 F.2d 543 (1964). The preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties; it is an overriding justification for what otherwise may be an illegal entry. It follows that a search warrant is not required to legalize an entry by police for the purpose of bringing emergency aid to an injured person. Frequently, the report of a death proves inaccurate and a spark of life remains, sufficient to respond to emergency police aid. As a general rule, we think, an emergency may be said to exist, within the meaning of the 'exigency' rule whenever the police have credible information that an unnatural death has, or may have, occurred. And the criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact." 227 A.2d at 489.

■ The report of a homicide or the existence of circumstances in which an un-

---

2. Two other courts have recently discussed and upheld the emergency doctrine where the police, once having been admitted to the premises, carried out an investigation without obtaining search warrants. Both cases involved homicide or serious bodily injury, and in both, the warrantless investigations were approved. State v. Hyde, 260 Ohio App.2d 32, 268 N.E.2d 820; State v. Oakes, 129 Vt. 241, 276 A.2d 18.

natural death could have occurred can, therefore, constitute an emergency within the rule of United States v. Barone, *supra*.

While the instant case is factually different from Patrick and the other cases cited above, in that there was neither first-hand knowledge of the homicide by the informant nor by the police, we agree with the Delaware Supreme Court that "it was the duty of the police to act forthwith upon the report of the emergency—not to speculate upon the accuracy of the report . . . ." 227 A.2d at 489. Not every report of a homicide or violent injury gives rise to the operation of this exception to the Fourth Amendment requirement of a warrant to enter and search a house. Often, there are circumstances which vitiate the need for quick response by the police, and take the problem completely out of the emergency context.

One of these situations occurred in Root v. Gauper, 438 F.2d 361 (10th Cir. 1971). The police learned of a shooting from the telephone operator who had handled the victim's call for an ambulance. The police immediately drove towards defendant's home where the shooting had occurred, and they passed the ambulance with the victim on its way to the hospital. The officers proceeded to the premises anyway, entered, and made an investigation. In affirming the grant of defendant's application for post conviction habeas corpus, the court held that no emergency existed when the officers arrived. They knew the victim was no longer in the house, and they, therefore, had no reason to enter without a warrant.

In Condon v. People, Colo., 489 P.2d 1297, the Supreme Court of Colorado refused to apply the emergency exception. The police had entered a house without a warrant after detecting an odor resembling that of a decomposing body emanating from the house. In short, no emergency could be said to exist sufficient to justify their warrantless entry, for "if there had been a decomposing body, there would be no hope of revival . . . ." and, thus, no need for quick entry by the police.

█ In the instant case, the police attempted to corroborate the story of a homicide by attempting to telephone the victim and, only after receiving no answer and driving around the house to see if anything was amiss, did the officers enter the house. Once inside, they went to the victim's room, discovered the body and then departed. We find that the police were reasonable in so investigating the reported homicide, and that no error was committed in allowing testimony about the discovery of the victim upon the first search of appellant's home.

█ Having, thus, determined that the initial entry into appellant's house was lawful, we look to his contention that the later entries were unlawful for lack of a warrant or his freely, voluntarily given consent to search the premises.

In Brown v. State, supra, this Court held that there was no violation of appellant's constitutional rights when the authorities repeatedly entered the premises under similar circumstances. Following a lawful entry in the early morning hours, the authorities returned to the house several times over the next twelve hours and, in the defendant's absence, searched and obtained various items of evidence. This Court, in Brown, said the subsequent searches were justified:

> "Under these circumstances, it became the officers' duty to conduct a thorough investigation into the circumstances. Certainly this duty carried with it the right to inspect the premises."

In the instant case, the original entry by the authorities was lawful. Their continuing investigation later in the morning and afternoon of January 27 was within their duties to investigate thoroughly the circumstances of the homicide.

Having lawfully entered the premises and discovered that a homicide had oc-

curred, the authorities were justified in conducting the investigation, and it was not error to admit the fruits of that investigation into evidence.

Appellant's second and third contentions are that the court erred in failing to suppress evidence taken from him and the pickup truck from which he exited at the time of his arrest because the officers were without probable cause to make the warrantless arrest.

In the instant case, a deceased person was found in the house occupied by appellant. Appellant drove to the house in the deceased's pickup truck and was observed carrying a large wooden box into the house after such discovery. Hammering noises were heard from within the house, and appellant was observed at the door looking in all directions.

■ We hold that, under the circumstances herein observed by the officers and the facts known by them, the officers had probable cause to arrest and the search incident thereto was reasonable. Lara v. State, Tex.Cr.App., 469 S.W.2d 177. See Clark v. State, Tex.Cr.App., 483 S.W.2d 465; Johnson v. State, Tex.Cr.App., 481 S.W.2d 864; Calhoun v. State, Tex.Cr. App., 466 S.W.2d 304.

Appellant contends that the trial court erred in refusing to place District Attorney Bass under the rule of Art. 36.03, Vernon's Ann.C.C.P. Bass was called as a witness for the State during the trial. The record reflects that the State's case in chief was presented by an assistant district attorney, and the assistant also conducted cross-examination of the defense witnesses.

"It is well established that the object to be attained by placing witnesses under the rule is to prevent one witness from being influenced by . . . another." Carlile v. State, Tex.Cr.App., 451 S.W.2d 511, 512 (citations omitted).

Administration and enforcement of the rule is within the discretion of the court, Art. 36.04, V.A.C.C.P.; see Holley v. State, Tex.Cr.App., 366 S.W.2d 570; Bishop v. State, 81 Tex.Cr.R. 96, 194 S.W. 389; Hahn v. State, 73 Tex.Cr.R. 409, 165 S.W. 218. Moreover, certain witnesses, including those who are attorneys in the case, are ordinarily excused from the operation of the rule and are permitted to remain in the courtroom during other witnesses' testimony. Dominguez v. State, 161 Tex.Cr. R. 124, 275 S.W.2d 677; Asher v. State, 102 Tex.Cr.R. 162, 277 S.W. 1099; Pounds v. State, 89 Tex.Cr.R. 273, 230 S.W. 683; Boatmeyer v. State, 31 Tex.Cr.R. 473, 20 S.W. 1102.

Appellant contends that it was error to exempt the district attorney from the rule in the instant case because an assistant handled the trial, and the district attorney did not personally participate in any role except that of witness.

■■ It is true that the purpose of exempting attorneys is to enable them to participate in the trial as officers of the court. This Court has protected the rights of State's attorneys, Dominguez v. State, supra; Pounds v. State, supra; Asher v. State, supra, and defense attorneys, Carlile v. State, supra; Jackson v. State, 55 Tex. Cr.R. 79, 115 S.W. 262, to remain in the courtroom and be exempt from the rule.

Appellant has not demonstrated that the trial court abused his discretion in the instant case. The only support of his contention is his assertion that the district attorney did not appear on behalf of the State in the trial of the cause.

This Court is unable to ascertain from the evidence either that the district attorney's presence was unnecessary or even that he did not in some way participate in the prosecution of this cause. We reject appellant's contention that the court abused its discretion in exempting the district attorney from the rule.

Appellant contends that the trial court erred in overruling his written motion to make available, for cross-examination of the witness Terry Simmons, a written

statement of the witness given three days after appellant's arrest.

Following Simmons' testimony as a witness for the State, appellant filed a written motion to obtain the prior written statement. The motion was overruled, and appellant urges that this violated his right under the rule announced in Gaskin v. State, 172 Tex.Cr.R. 7, 353 S.W.2d 467, to inspect the statement.

This Court recently said in Zanders v. State, Tex.Cr.App., 480 S.W.2d 708, that the defendant "(i)s entitled to inspect and use such prior and available report or statement for cross examination and impeachment purposes, and this right obtains even though the witness has not used the instrument to refresh his memory." 480 S.W.2d at 710.

■ Although the record reflects no exhibition of the statement was made before the jury, the appellant was clearly entitled to have a copy of the statement, and the trial court's ruling on the motion was error.

As was noted in Zanders, however, when the statement is not used before the jury, the appellant's burden is not completed by proving only the erroneous denial of the motion. This error is grounds for reversal only upon a showing that harm occurred. Campos v. State, Tex.Cr.App., 468 S.W.2d 81; Sewell v. State, Tex.Cr.App., 367 S.W.2d 349.

■ Allegations that the Gaskin rule has been violated necessitate that the statement in issue be included in the appellate record in order for this Court to identify any harm that resulted from appellant's failure to obtain the statement. Zanders v. State, supra; Gaskin v. State, supra; Martinez v. State, 172 Tex.Cr.R. 186, 354 S.W.2d 936.

Appellant's Motion for New Trial recited as error the trial court's failure to allow him to inspect the statement, and appellant further preserved the error by filing a Motion to Include Original of Witness' Statement in record on appeal. See Leal v. State, Tex.Cr.App., 442 S.W.2d 736 (concurring opinion). The motion was granted by the court and, while forwarded within the State's appellate brief, it was incorporated by reference into the record on appeal by the court,[3] and it is now before us on appeal. Cf. Rodriguez v. State, 172 Tex. Cr.R. 540, 360 S.W.2d 406; Hughes v. State, 172 Tex.Cr.R. 441, 358 S.W.2d 386; Martinez v. State, supra.

■ Having carefully examined the witness' statement and compared it to his testimony in the trial, we find no basis upon which harm was caused appellant by his failure to inspect the statement for cross-examination. The statement is consistent with the testimony of the witness, and the error in refusing to deliver the statement to the appellant is, therefore, harmless. Campos v. State, supra; Henley v. State, Tex.Cr.App., 387 S.W.2d 877; Rodriguez v. State, supra.

■ Appellant's sixth contention alleges harm resulted from testimony by the wife of the deceased, T. E. Smith, in which she described a conversation she had with Smith on the morning of his death regarding checks written by the appellant on Smith's bank account, and that Smith left for Freeport to see appellant about the checks, and she never saw her husband alive after he left.

In Porter v. State, 86 Tex.Cr.R. 23, 215 S.W. 201, the mother of the deceased testified that deceased said at 9:00 P.M. that she was going to meet defendant at a particular location, and that defendant was going to take her to Nolanville so she could board a train for San Angelo. The

3. The court, in its order granting appellant's motion, noted that the original of the statement of the witness Terry Simmons was attached to the State's brief "on file herein" and "such original is hereby made a part of the record on appeal in this case and incorporated herein by reference."

deceased departed the mother's home at about 11:00 P.M., and her body was found nine days later in a river near the point of her rendezvous with the defendant. With respect to the mother's testimony, this Court said:

"We think that statements made by deceased to her mother while she was packing her clothes and dressing, preparatory to leaving home on the night of her disappearance, in addition to the reasons given in the original opinion, were res gestae of such acts directly explanatory thereof, and admissible in evidence." 215 S.W. at 213.

In Chance v. State, 125 Tex.Cr.R. 318, 68 S.W.2d 212, this Court again cited authorities supporting the admissibility of hearsay statements made out of the presence of the accused as a part of the res gestae of the transaction between the declarant and the accused. The declarant, in Chance, was, as in Porter and the instant case, the victim of murder. This Court said:

"Deceased announced his intention of going, had a taxi called to take him . . . and the testimony of his statement as to who he was going to see was admissible as showing the motive of his going, and as fixing its destination and character, and same became thus a proper part of the res gestae of such going." 68 S.W.2d at 213.

In the instant case, the testimony by the wife of the deceased was admissible as part of the res gestae and explanatory of her husband's meeting with the appellant on January 26, 1970. See Marshall v. State, Tex.Cr.App., 384 S.W.2d 893; Newton v. State, 147 Tex.Cr.R. 400, 180 S.W. 2d 946 (on motion for rehearing).

Appellant contends that the court erred in refusing to grant his requested charge that intent to kill is a necessary element of murder.

Appellant's requested instruction required that the jury must believe from the evidence beyond a reasonable doubt that the appellant intended to kill the deceased before they would be warranted in finding him guilty of murder and, if they did not so believe from the evidence beyond a reasonable doubt, then to acquit appellant of murder and consider whether or not he is guilty of aggravated assault.

Appellant relies on 4 Branch's Ann.P.C., Section 2299, page 656, as authority where it is stated that a defendant is entitled to a charge on intent to kill "where the killing of the deceased was with a weapon not deadly per se and the *defendant claimed that such killing was unintentional . . . .*" (emphasis supplied)

Dr. Joseph A. Jachimczyk, medical examiner for Harris County, testified that deceased "died as a result of a broken neck and a fractured skull, blunt trauma to the head."

Simmons testified that appellant told him that he hit deceased "as hard as he could in the back of the head with that pipe" and "that Smitty slumped forward into the bed or on the bed, I don't remember which, and that he was still making some sort of noise and twitching or kicking or moving, whatever and that he hit him until he quit moving."

Art. 1256, Vernon's Ann.P.C., provides, "Whoever shall voluntarily kill any person within this State shall be guilty of murder. Murder shall be distinguished from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or which excuse or justify the killing."

The definition of murder in the court's charge is identical to Art. 1256, V.A.P.C. The court then instructed the jury that " 'voluntarily' means done by design or *intentionally* and purposely, by one's own will; not accidentally." (emphasis supplied) The definition of malice aforethought, in the charge, included, "It is the doing of a wrongful act *intentionally,* without just cause or excuse." (emphasis supplied)

Where the deceased is killed by a weapon which is deadly per se, it has been held that a charge on intent to kill or aggravated assault need not be given even where the defendant testifies that he had no intent to kill. See Arocha v. State, 118 Tex.Cr.R. 391, 39 S.W.2d 1097; Barr v. State, 146 Tex.Cr.R. 178, 172 S.W.2d 322, and cases cited therein.

While a number of cases would appear to hold that when death was caused by a weapon which was not deadly per se a charge on intent to kill is required, a review of these cases reflects that the evidence either raised or the defendant denied a lack of intent to kill. See Gomez v. State, 116 Tex.Cr.R. 529, 34 S.W.2d 607; Shannon v. State, 117 Tex.Cr.R. 429, 36 S.W.2d 521; Briscoe v. State, 122 Tex.Cr.R. 491, 56 S.W.2d 458; Johnson v. State, 125 Tex.Cr.R. 381, 68 S.W.2d 202; Sullivan v. State, 146 Tex.Cr.R. 79, 171 S.W.2d 353; Bell v. State, 148 Tex.Cr.R. 573, 189 S.W.2d 1022; Goldman v. State, 150 Tex. Cr.R. 24, 198 S.W.2d 895; Baylor v. State, 151 Tex.Cr.R. 365, 208 S.W.2d 558.

In the instant case, appellant did not testify, and we find no evidence which raises an issue of lack of intent to kill.

Appellant's requested instruction on intent to kill requires the jury to consider whether or not appellant is guilty of aggravated assault if they fail to find an intent to kill. Appellant requested that the jury be charged on the law of aggravated assault and complains on appeal of the court's refusal to grant his requested charge thereon.

"Under a charge of murder, issue of aggravated assault is raised when the instrument with which the murder is inflicted is not a deadly weapon per se or one which in the manner of its use, is not ordinarily calculated to produce death, and when, *in addition thereto, the evidence raises the issue of a lack of intent on the part of the accused to kill."* (emphasis supplied) Barnett v. State, 144 Tex.Cr.R. 249, 162 S.W.2d 411; see

Mounts v. State, 148 Tex.Cr.R. 177, 185 S.W.2d 731.

The foregoing cases, dealing with the question of when the issue of aggravated assault is raised in murder cases, require that the evidence raise the issue of lack of intent to kill to warrant a charge on aggravated assault.

In the instant case, the only testimony regarding the killing comes from the witness Simmons. It serves to negate a lack of intent to kill on the part of appellant. The admission of appellant regarding the beating of deceased with a pipe as related by Simmons reflects that the weapon was used in a deadly manner.

The jury was required to find that appellant "voluntarily" and with "malice aforethought" killed deceased before they could find appellant guilty of murder with malice aforethought. The jury was instructed that voluntarily means "intentionally" and included in the definition of malice aforethought, "It is the doing of a wrongful act intentionally." See Whiteside v. State, 115 Tex.Cr.R. 274, 29 S.W.2d 399.

The testimony of Simmons and Dr. Jachimczyk reflects that the weapon which inflicted death was used in a deadly manner and their testimony negates a lack of intent to kill. We find no evidence in the record before us which suggests a lack of intent to kill.

No error is shown in the court's refusal to grant appellant's requested charge on intent to kill.

Appellant's eighth contention is that the trial court erred in refusing to charge the jury on the law of circumstantial evidence. Appellant recognizes the general rule that the charge need not be given where there is in evidence an admission or a confession by the accused admitting that he killed the deceased. Steel v. State, Tex.Cr.App., 459 S.W.2d 649; Patterson v. State, Tex.Cr.App., 416 S.W.2d 816; Cava-

zos v. State, Tex.Cr.App., 365 S.W.2d 178; 4 Branch's Anno.P.C., Section 2050.

He urges, however, that Davidson v. State, 109 Tex.Cr.R. 251, 4 S.W.2d 74, necessitates that the charge be given where there is doubt about the matter described by the defendant in his statement, and that the appellant's statement related by the witness Simmons, while not under arrest, leaves that kind of doubt. We do not agree that the testimony of Simmons raises such doubt. No error is shown in refusing the charge on circumstantial evidence.

■ The ninth contention urged by appellant relates to failure of the trial court to instruct the jury on murder without malice.

As this Court noted in Garza v. State, Tex.Cr.App., 479 S.W.2d 294, 295:

"The failure to instruct the jury on the question of murder without malice is not error unless there is some testimony which raises the issue and therefore calls for such a charge. Dickson v. State, 463 S.W.2d 20 (Tex.Cr.App.1971); 4 Branch's Ann.P.C.2d, Sec. 2302, p. 658."

The charge on murder without malice is mandatory only in cases where there is evidence that the defendant acted under the immediate influence of sudden passion arising from an adequate cause. Art. 1257c, V.A.P.C.; Ortegon v. State, Tex.Cr.App. 459 S.W.2d 646.

We find no evidence in the record which requires a charge on murder without malice.

Appellant's tenth contention is that the court erred in not instructing the jury on aggravated assault.

■ As heretofore discussed, no issue of lack of intent to kill was raised. A charge on aggravated assault was not required.

■ Appellant contends that there is a fatal variance between allegations of the indictment that the deceased was killed by beating in a manner and means unknown to the grand jury and the evidence which he contends proved the means could have been ascertained.

The indictment recites that appellant "did kill Tullus E. Smith by striking and beating him in some way or manner, and by some means, instruments and weapons to the Grand Jurors unknown . . . ."

"The averment of an indictment that the means causing death was unknown to the grand jury is a material allegation, the substance of which must be proven as pleaded. This requirement, however, is deemed sufficiently met, if the development of the facts on the trial shows the means of death to be uncertain. It is otherwise, however, if such facts raise an issue as to whether the means of death were known, or could have been known, to the grand jurors by the exercise of reasonable diligence. In such case proof must be made of the lack of knowledge of such fact by the grand jurors, and that reasonable diligence was used to ascertain same." Mitchell v. State, 111 Tex.Cr.R. 101, 10 S.W.2d 87, 89.

The foreman of the grand jury that returned the indictment against appellant testified that the grand jury was unable to determine the weapon used in the killing. No weapon was introduced into evidence although Simmons testified that appellant admitted having beaten the deceased with a piece of pipe.

Appellant contends that Simmons' testimony, plus that of the medical examiner that the death blow *could* have been rendered by a man the size of appellant wielding a length of pipe, raises an issue as to whether the cause of death could have been known. (emphasis supplied)

The uncertainty of the medical examiner's testimony is reflected by his statement that the blow on the head of the deceased could have come from "something

striking the head, or conversely, the head striking something" and "the cut itself could have occurred from the head striking some edge of a table."

Appellant urges the State should have proved the grand jury used due diligence to ascertain the means. In Curry v. State, Tex.Cr.App., 468 S.W.2d 455; Mitchell v. State, 111 Tex.Cr.R. 101, 10 S.W.2d 87; Moree v. State, 147 Tex.Cr.R. 564, 183 S.W.2d 166; Gragg v. State, 152 Tex.Cr.R. 386, 214 S.W.2d 292; Clark v. State, 151 Tex.Cr.R. 383, 208 S.W.2d 637; McNeil v. State, 131 Tex.Cr.R. 553, 100 S.W.2d 365, and Bookman v. State, 112 Tex.Cr.R. 233, 16 S.W.2d 123, relied on by appellant, there is no showing that anyone testified that the grand jury was unable to determine the murder weapon. In the instant case, the foreman of the grand jury testified that the grand jury was unable to determine the weapon. See Anderson v. State, Tex.Cr.App., 479 S.W.2d 57.

In the present case, there were no eye witnesses to the killing. No pipe, weapon, or other instrument purporting to be the murder weapon was introduced into evidence nor is there anything in the record to reflect that the police ever found the murder weapon. Further, the evidence does not reflect that the grand jurors were wanting in diligence in failing to find it. The court, in its charge, instructed the jury to find appellant guilty if they found appellant killed the deceased "by striking and beating him in some way or manner, and by some means, instruments, and weapons to the Grand Jury unknown." We find the evidence sufficient to support the conviction and consistent with allegations in the indictment.

 Appellant contends that he was denied effective assistance of counsel in the trial court.

The record in this case shows that two attorneys were appointed to represent appellant. They filed numerous pretrial motions including motions in limine, motions to suppress evidence, motions for discovery of records, statements of witnesses, and other evidence; they subpoenaed many witnesses and obtained written depositions from several.

During the trial, they objected continuously to the introduction of the State's evidence, cross-examined the State's witnesses, and they timely objected in writing to the court's charge, while providing the court with their own requested instructions.

Appellant now contends he was harmed by counsel's failure to secure the attendance of other witnesses to investigate adequately appellant's background and that of other individuals suggested by appellant. Similarly, he complains of their failure to raise particular issues in the objections to the charge and the motion for new trial. In light of the thoroughness with which the attorneys conducted the case on appellant's behalf, we are unable to find that any harm resulted from the manner in which they represented him. The numerous grounds of error preserved for appeal by trial counsel belies the claim of ineffective counsel.

This Court has often expressed the view, particularly appropriate in this case, that it will not use hindsight to evaluate critically the efforts of appointed trial attorneys when it is apparent that they have rendered reasonably effective assistance in defense of their clients. Satillan v. State, Tex.Cr.App., 470 S.W.2d 677.

The instant case is clearly distinguishable from Vessels v. State, Tex.Cr.App., 432 S.W.2d 108, upon which appellant now relies. We have found none of the critical errors by appellant's counsel that were identified in Vessels on Motion for Rehearing as indicative of ineffective representation under MacKenna v. Ellis, 280 F.2d 592 (5th Cir.).

Finding no reversible error, the judgment is affirmed.

Opinion approved by the Court.