**George Braddock OGLE, II, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 50159.**

Court of Criminal Appeals of Texas.

Nov. 5, 1975.

On Rehearing June 9, 1976.

Rehearing Denied April 6, 1977.

---

1. Sections 2.103, 2.201, 2.205, 2.207(b), 2.209(b), 2.314, 2.327, 2.402(b), 2.403, 2.509(c), 2.603, 2.605(a)(2), and 2.609(b).

361

Frank S. Wright, Charles W. Tessmer, Ronald L. Goranson, Dallas, for appellant.

Henry Wade, Dist. Atty., and Steve Wilensky, Les Eubanks and Rusty Ormesher, Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

MORRISON, Judge.

The offense is kidnapping for extortion under Article 1177a, V.A.P.C.; the punishment, 50 years.

The sufficiency of the evidence is not challenged, but we briefly observe that a twelve year old boy was abducted and then released after the payment of the ransom. Through the efforts of FBI agents, appellant was arrested on the same day and the ransom money was recovered.

Grounds of error one, two and three relate to the failure of the court to provide the appellant copies of reports made by nine FBI agents in the course of their investigation. After each agent testified, appellant's counsel requested the reports for the purposes of impeachment and cross-examination. The court denied each request. At the close of the evidence, the trial court admitted the reports in evidence for purposes of the record only. In two post trial hearings, the trial court assured appellant's counsel that the reports would be included in the record on appeal, but the reports were not part of the record transmitted to this Court. Pursuant to an order by this Court, the reports are now before us.

It is clear that appellant, upon request, was entitled to inspect the prior statements of the nine FBI agents who testified, even though they did not use the reports to refresh their memories. *Gaskin v. State*, 172 Tex.Cr.R. 7, 353 S.W.2d 467; *Zanders v. State*, Tex.Cr.App., 480 S.W.2d 708.[1]

The trial court erred in not allowing appellant's counsel use of the reports during trial, but such error is harmless when the witness' testimony is entirely consistent with the prior statement and almost all of the information contained in the statement is developed during the trial. *Stein v. State*, Tex.Cr.App., 514 S.W.2d 927; *White v. State*, Tex.Cr.App., 496 S.W.2d 642.

However, in the case at bar, appellant's sole defense was that he was suffering from chicken pox encephalitis which rendered him incapable of conforming his conduct to the requirements of what he knew was right and wrong. In this defense he was supported by the testimony of Dr. Holbrook and Dr. Reedy. Throughout the trial, references were made to a visit appellant had made to Dr. Kassanoff for treatment of chicken pox within hours after the commission of this offense and a very short while before his arrest. Dr. Kassanoff's opinion as to the appellant's mental condition at the time of such visit was thus of vital importance in determining the validity or invalidity of his defensive theory. Dr. Kassanoff was not a witness, and no explanation was made as to why he was not called as a witness by either the State or the appellant. His report was not introduced in evidence but repeated references were made to his report as showing that appellant exhibited no signs of abnormality.

Special Agent Meyer's report as to his interview with Dr. Kassanoff was among the statements which appellant's counsel made repeated demands to see so that he might use the same in cross examining Meyer, and which the trial court refused to let him see, saying that he had reviewed it and found nothing beneficial to this appellant. All through Meyer's testimony he expressed the opinion that the appellant was "rational" when he saw him within hours after the commission of the offense.

However, Meyer's report contains the following:

"Dr. Kassanoff stated he considered Ogle to be somewhat different in his behavior from a normal individual and he stated he had possibly indicated signs of sociopathic behavior.

\* \* \* \* \* \*

Dr. Kassanoff stated that his contact with Ogle on this occasion again seemed somewhat abnormal. He said that it was his opinion that Ogle, at that time, seemed unconcerned with his case of the chicken pox, but again exhibited problems of a possible sociopathic nature.

\* \* \* \* \* \*

Ogle's competency examinations indicate he was temporarily unable substantially to appreciate right from wrong at time captioned crime committed."

During the cross examination of Dr. Reedy, a lengthy hypothetical question was propounded by the prosecutor. We quote only a portion thereof:

"Assume that on the date he visits a Dr. Kassanoff and keeps an appointment that he had to do so at 3:15, and at that occasion Dr. Kassanoff conducts a brief neurological check which shows no abnormalities. Assume—

[APPELLANT'S COUNSEL]: To which I object, Judge, as not, that's not in evidence.

THE COURT: He is basing this on an assumption, counsel. Go ahead."

It is immediately apparent that under the Gaskin Rule[2] the appellant was entitled to examine Agent Meyer's report and use the

1. We also observe that once a federal employee testifies in a state court prosecution his reports should be available to the accused for the purpose of cross examination. Cf. *Lewis v. U. S.*,

340 F.2d 678 (8th Cir. 1965), and cases cited therein.

2. *Gaskin v. State*, supra. See also *Jackson v. State*, Tex.Cr.App., 506 S.W.2d 620.

same in cross-examination. The fact that the FBI report in a manner supported appellant's sole defense of insanity clearly demonstrates the harm which resulted from the trial court's refusal to allow such cross-examination from the report.

The judgment is reversed and the cause remanded.

DOUGLAS, J., not participating.

## OPINION ON STATE'S MOTION FOR REHEARING

### PART I

DOUGLAS, Judge.

In an earlier opinion, this cause was reversed because several Federal Bureau of Investigation agents testified and appellant was denied the right to look at their combined report for the purpose of cross-examination. Since that opinion was written, this Court has ordered a copy of the 100-page report of the Federal Bureau of Investigation which is a compilation of the work of nine agents to be made available to counsel for appellant. Time was granted for the filing of supplemental briefs to determine if reversible error was committed for the failure to make available the report in the trial court. A copy of the report was furnished, and both briefs are now before the Court. The entire case will be reviewed to see if reversible error was committed.

The evidence shows that appellant, at gunpoint, took Phillip Ross Terry, a student, from an elementary school yard. After taking him appellant demanded a large sum of money from the boy's father who was president of a bank and received money for the release of the boy. Most of the money taken was found in appellant's home the day of the kidnapping. The sufficiency of the evidence is not challenged, but a statement of proof will be set out so that appellant's contentions may be properly considered.

Tom Freeman operated a Gulf service station and a Hertz Rent-a-Car agency on Preston Road on Northwest Highway. At about 8:00 o'clock in the morning of February 20, 1973, a Mr. Ogle called and asked to rent a car. A few minutes later a man walked in and said that he was Mr. Ogle and that he had reserved a car and stated that his wife's car was in the shop. (It was later shown that the wife's car was not in a shop.) Ogle rented a small green Capri automobile for one day. He gave his address as 6524 Dartbrook. The rental was charged on an American Express credit card. Freeman wrote down Ogle's driver's license number. Ogle did not return the car but Freeman picked it up later at 6524 Dartbrook where Ogle and his family lived. It had been driven 68 or 69 miles. At the trial Freeman could not positively identify appellant as the person who rented the car.

Arleta Taylor testified that she was a cook and waitress at the Comanche Springs Inn on North Central and that at approximately 8:30 in the morning of February 20, 1973, she saw appellant enter the motel. Jewel LeFlore, the desk clerk, testified that appellant rented Room 256 at the motel and signed the name G. Braddock Ogle. He gave his address as 6524 Dartbrook in Dallas. He used the American Express credit card. She gave him the key to Room 256. Seven calls were made from the telephone and registered on Room 256 that day. She thought she saw him leave the motel in a small green car. Donald Williams, a construction worker at the motel, testified that he saw appellant leave the motel in a green Capri automobile on the day in question.

Janice Speights, a secretary at the Northwood Hills Elementary School in Dallas, testified that at about 9:28 in the morning on the day in question a man called and stated that he was Kenneth Terry, Phil Terry's father, and stated that he had to take Phil out of school for a couple of hours because "Richardson General had called and said that they were going to have to take tests." He told her to have Phil meet him at the bicycle racks.

Phillip Ross Terry testified that he was twelve years of age and attended Northwood Hills Elementary School. In response to a call he went by the principal's office

and was told to meet his father at the bicycle racks. He related that a man was at the racks in a small green automobile and that the man was wearing a ski mask and sun shades. The man told him to get in the car. He started to run but the man pulled a dark colored revolver and told him to lie down in the back seat and cover his eyes. After the man drove the car a short distance, he turned and handed Phil some tape and had him cover his eyes with it. Phil did so but left a slight opening at the bottom. He knew the area well and tried to be sure where he was being driven. He knew that they drove onto Central Expressway. The car stopped, they got out and the man put his hand on his shoulder and they went up some stairs. The man opened the door and they went into a room that had yellow, red and blue, different colored striped carpet that he could see from below the tape. The man made him lie down on the bed which had a yellow bedspread. The man then picked up the telephone and dialed and his voice sounded like he had something in his mouth. He heard the man say that he was Mr. Shaw, that he was a CPA or something like that and that he asked to speak to Mr. Terry. He dialed some three or four times over a period of fifteen to twenty minutes before he could talk to Mr. Terry. When the man finally got Mr. Terry on the telephone he said that he was Mr. Shaw and that "we have your son and we'd like, I think, $200,000 in 'low' bills to be placed on a ramp on Central Expressway by the bank." Phil talked to his father during the call. The man told Mr. Terry that he had some seven minutes to deliver the money.

Phil could hear workmen around the building, hammering and sawing. Later Phil directed Federal Bureau of Investigation agents over the route that he had taken and then showed them the room which had carpeting and a bedspread just like the ones where he had been. After completing his telephone calls, the man took him out to the car and he heard sounds that were apparently from the expressway. The car stopped, he thought right at the expressway, and he heard the door open and

heard what sounded like noise from a paper sack. Then the man got in the car and drove away. He sounded like he was counting the money and all of a sudden he stopped. The man got out and told Phil to count to a thousand. He drove off and came back and circled; he thought the man was going to run over him. The man stopped and said to hand him the tape and to keep his eyes closed. Phil did as he was told. Later he went to a nearby school and talked to the principal. FBI agents later took him to Dartbrook Street to where a man, Brad Ogle, lived and he saw a green automobile with a tan interior like the one in which he had ridden. Phil recognized the neighborhood where he had been nearby playing with other children. He had met Mrs. Ogle some two years before but had never met Mr. Ogle.

Some two days after the incident in question, Phil heard a voice on television. He looked and saw a man. It was the voice of the man who had taken him in the car. The man on television was Ogle who was sitting in the courtroom.

Katherine Wood, a secretary to Kenneth Terry, received a call at approximately 10:00 o'clock on February 20 and the man identified himself as Mr. Shaw, a CPA, and wanted to speak to Mr. Terry. The voice appeared to be distorted or strange. She testified that Mr. Terry had customers and that the man called back several times. When she asked him the nature of the call, he said that it was about Phil and hung up. They were in the process of checking to see if there were any Shaws listed as CPAs in the yellow pages when the man called back. Terry took this call (which was a demand for ransom money). Katherine Wood then called the school and found out that Phil was not there. Gordon Shanklin of the FBI was called. Quite a bit of money was gathered at the bank and she watched Terry leave with the money in a brown paper bag under his arm. She testified that Terry stopped on the ramp of the expressway and set the paper bag out on the driver's side on the grass. About twenty minutes later a man drove up in a green sports car and

picked up the money. She was not close enough to see the license plate. The FBI came just a few minutes after the money was picked up.

Kenneth Terry, the father of Phil Terry, was president of The First Bank and Trust Company. He testified that he received the call and that the man said, "We have your son and we want money." The man was talking in a strange, garbled, and what he thought to be a disguised voice. The man said, "We want $200,000 in small, unmarked bills," and to place the money on the north ramp of Central Expressway at Spring Valley Crossing. He told them not to sound an alarm. Terry talked to his son Phil over the telephone and he testified that he could hear him crying. They did not have the full $200,000 but he got all the money he could without alerting the tellers for fear that he was being watched and that something would happen. He placed what was later determined to be $56,950 in two paper sacks.

Terry had known Ogle since the summer of 1971 and had talked with him in the office. After returning to the bank, Terry watched a green car come by and the driver did not get out but stopped and picked up the money. Terry later went to a dealership and identified a Capri as the kind of car he had seen. He saw one like it at the home of George Ogle on the afternoon of the kidnapping. He testified that he was present when Phil directed the FBI agents over the route that he had gone and to the Comanche Springs Motel on Central Expressway.

The FBI agents testified that Phil took them over the route that he had been and to the motel. FBI Agent James Hogan testified that he got the registration receipts and went to Ogle's residence on Dartbrook. Herbert A. Grubert, agent in charge of the Dallas Division of Federal Bureau of Investigation, testified that he saw appellant at the home and he read his rights to him. Appellant told him that he had a green car he had rented that morning from Hertz Rent-a-Car. He said that he had rented a motel room at Comanche

Springs Motel that morning for his attorney from Arizona. It was later shown that the attorney was engaged in a murder trial in Arizona during the week of the kidnapping. Ogle was asked if he kept large sums of money. He replied that he had $48,000 or $49,000 cash there. During this time Ogle talked rationally and he signed the consent form to search. A short time later he called an attorney and then withdrew the permission to search. Later, after consulting with his attorney, Ogle again agreed to the search. FBI agents found ashes of paper money wrappers in the fireplace. They found a Hertz rental agreement in the front area of the green Capri that showed the imprint of the credit card. Agent Hogan testified that they found a ski mask and gloves in a furniture drawer and the room key to Room 256 was found in the home. The American Express credit card receipt for the room was also found and was introduced. A .22 caliber revolver and gloves were found.

Ted Cope, a teller at the bank, was shown the money which had been taken from appellant's home. He identified a dozen or so bills which had his mark on them. Florence Hawkins, a teller at the bank, marked some money for counting purposes earlier as she put it in wrappers and she picked out approximately 100 bills that she had marked that had been in the bank prior to the time it was taken by Terry.

Jim Neal, an attorney, testified that appellant owed the American Bank and Trust Company some $90,000 and he had agreed to pay it back in February. It was also shown that appellant owed other large debts and was in dire financial straits. He had promised to pay the debts in February

Shirley Ogle, appellant's wife, testified that she had taken appellant to Dr. Kassanoff on the 12th of February and that Dr. Berryman also saw him. She also related that appellant had chicken pox on the 15th or 16th.

Dr. Holbrook testified in effect that on the date of the offense appellant was temporarily insane. While he was testifying, the prosecutor stated, "Let the record re-

flect that he is reading from Dr. Kassanoff's report." The State offered to put Dr. Kassanoff's report into evidence. Dr. Reedy supported Dr. Holbrook's testimony on the defense of temporary insanity because of encephalitis caused by chicken pox. There was no contention that appellant was incompetent to stand trial or that he had been insane at any other time.

There is no contest as to the facts as to the commission of the acts alleged in the indictment. In fact, appellant's counsel stated in his argument to the jury that appellant had something to do with the case. No one called Dr. Berryman or Dr. Kassanoff to testify.

Two psychiatrists for the State testified that appellant had a sociopathic disorder and he had nothing to show encephalitis on February 20. There was no loss of control and he was not suffering from encephalitis. From their testimony it appears that sociopathic behavior is an anti-social attitude common in the vast majority of criminals.

Appellant did not testify.

Grounds of error one, two and three relate to the failure of the court to provide appellant copies of reports made by nine FBI agents in the course of their investigation. After each agent testified, appellant's counsel requested the report for the purposes of impeachment and cross-examination. At the close of the evidence, the trial court included the report in the record. The report containing the prior statements of the nine FBI agents who testified should have been made available to counsel for the defense even though they did not use the report to refresh their memories from the statements. *Gaskin v. State*, 172 Tex.Cr.R. 7, 353 S.W.2d 467 (1962); *Zanders v. State*, 480 S.W.2d 708 (Tex.Cr.App.1972).[1]

The trial court erred in not allowing appellant's counsel the use of the report during the trial, but such error is harmless when the witness' testimony is entirely consistent with his prior statement and almost all of the information contained in the statement is developed during the trial. *Stein v. State*, 514 S.W.2d 927 (Tex.Cr.App. 1974); *White v. State*, 496 S.W.2d 642 (Tex. Cr.App.1973); *Corbett v. State*, 493 S.W.2d 940 (Tex.Cr.App.1973).

Appellant's sole defense was that he was suffering from chicken pox encephalitis to the extent that he could not substantially appreciate right from wrong nor adhere to nor conform his behavior to his knowledge of right and wrong at that time. This defense of temporary insanity was supported by the testimony of Dr. Holbrook and Dr. Reedy. Throughout the trial, references were made to appellant's visit to his private physician, Dr. Kassanoff, for treatment of chicken pox within hours after the commission of the instant offense and shortly before appellant's arrest. It appears from the record of the trial that appellant had possession of this doctor's report.

Special Agent Meyer's report as to his interview with Dr. Kassanoff was among the statements which appellant's counsel made repeated demands to see so that he might use the same in cross-examining Meyer, and which the trial court refused to let him see, saying that he had reviewed it and found nothing beneficial to this appellant. All through Meyer's testimony he expressed the opinion that the appellant was "rational" when he saw him within hours after the commission of the offense.

Meyer's report dictated on March 3, 1973, contains the following:

"Dr. Kassanoff stated he considered Ogle to be somewhat different in his behavior from a normal individual and he stated he had possibly indicated signs of sociopathic behavior.

" * * *

"Dr. Kassanoff stated that his contact with Ogle on this occasion again seemed somewhat abnormal. He said that it was his opinion that Ogle, at that time, seemed unconcerned with his case of the

---

1. We also observe that once a federal employee testifies in a state court prosecution his reports should be available to the accused for the pur-

pose of cross-examination. Cf. *Lewis v. Unites States*, 340 F.2d 678 (8th Cir. 1965), and cases cited therein.

chicken pox, but again exhibited problems of a possible sociopathic nature."

From this report of the interview with Dr. Kassanoff, it appears that appellant's physician would not support appellant's theory of temporary insanity.

Meyer's report dated June 22, 1973, contains the following statement:

"Ogle's competency examinations indicate he was temporarily unable substantially to appreciate right from wrong at time captioned crime committed."

At the time the June 22, 1973, report was prepared, Meyer had a copy of the letter from Dr. Holbrook to appellant's attorney, Frank S. Wright, giving the results of Holbrook's psychiatric examination of appellant. The above quoted statement from Meyer's report is no doubt a shorthand rendition of the results of this examination which were explained in detail in the doctor's report.

■ Since matters complained of in Meyer's report were clearly within the knowledge of appellant, no harm is shown. The report contained hearsay statements of what doctors told Agent Meyer. Meyer could not have been impeached by the hearsay testimony concerning what the doctor had told him.

Next appellant asserts that the FBI report made no mention of automobiles at appellant's residence at the interview and on the trial. Agent Meyer testified that appellant had told him that he had access to three automobiles on the day in question. There is an assertion that harm is shown but no indication of what the harm could have been. The evidence is without contradiction that appellant used the Capri rented from Hertz Rent-a-Car, and his having access to other cars was not a material issue.

Complaint is made that there was no mention in the report that Agent Meyer heard the U.S. Magistrate inform appellant of the charges against him and that he heard appellant give proper answers to the questions propounded him and that the answers were correct and appropriate. This was consistent with Agent Meyer's testimony. Cross-examination with this omission in the report could have furnished nothing new or inconsistent with other testimony of the agent.

There was no mention in the report that Mrs. Ogle was questioned. Agent Meyer testified that he asked Mrs. Ogle if she knew that they had $48,000 or $49,000 in the house and she stated that she did not know that and that they usually kept two or three hundred dollars.

The report indicated that Phillip Terry described the gun as having a light colored barrel, but could not identify it as a revolver or automatic. Phillip testified at the trial that the gun was a dark revolver.

There is a notation in the report that Phillip could recall no color around the holes in the ski mask for the eyes and mouth. He testified, ". . . the lining around the mask was a different color, and the mouth."

No mention of the conversation with Mrs. Terry was contained in the report. Agent Alford testified that he talked with Mrs. Terry and she was upset.

He contends that there was a contradiction in the report and the testimony of Agent Alford. The notation in the report reads: "Phillip was later shown room number 256 of this motel. . . ." and Agent Alford testified:

". . . at his discretion I was merely following him at this time. At his direction he went a few feet down the hallway and stopped and made a left turn into the door there that encloses a room."

and

"It was room 256."

The report included the following: "Phil said the bedspread was a yellow color," and the testimony of Agent Alford was, "The bedspread was perfectly explained by Phillip prior to our arrival there and this was exactly the bedspread on the bed."

■ These are not all, but are most of the instances where appellant claims that reversible error was committed by the failure to make the report available to him at the trial. If there be inconsistencies be-

tween the report and the testimony, they are not such as their use in cross-examination would change the verdict from that of guilty to not guilty.

The evidence is overwhelming as to appellant's action and guilt in the kidnapping; his having the money taken from the bank; his leasing of the car used in the kidnapping and his renting the room as a part of his scheme. Even appellant's counsel argued to the jury that appellant had something to do with the case.

In viewing the testimony in light of the defense of insanity at the time of the offense based upon encephalitis caused by chicken pox, we hold that the error in the failure to make available the report was harmless beyond a reasonable doubt.

The other grounds of error are overruled.[2] No reversible error has been shown. The State's motion for rehearing is granted and the judgment is now affirmed.

ROBERTS, J., concurs in the result.

**2.** Eight other grounds of error have been discussed in Part II of this opinion which consists of seven legal size pages. It is not for publication but is for the benefit of the parties. It will be treated as a per curiam opinion because it contains nothing that would add to our jurisprudence. See *Thompson v. State*, 514 S.W.2d 275 (Tex.Cr.App.1974); *Wood v. State*, 523 S.W.2d 248 (Tex.Cr.App.), and *Marshburn v. State*, 522 S.W.2d 900 (Tex.Cr.App.1975).